Commonwealth ex rel. Fox, Appellant, *v.* Fox.

Argued September 8, 1969. Before Wright, P. J., Watkins, Montgomery, Jacobs, Hoffman, Spaulding, and Cercone, JJ.

*G. Christianson,* with him *Alvin B. Lewis, Jr., James R. Whitman, Norbert J. Powell,* and *Lewis, Brubaker, Whitman and Christianson,* for appellant.

*James T. Reilly,* with him *Egli, Walter and Reilly,* for amicus curiae.

Opinion by Hoffman, J., December 11, 1969:

Gabrielle Fox filed a petition for writ of habeas corpus seeking the return of her five-year old son

James Fox from his father. After various hearings, the Court filed a memorandum opinion awarding the custody of the child neither to the mother nor the father, but to the boy's paternal aunt who was not a party to the proceeding.

The only justification given by the Court in its one-page opinion is "that the natural parents of the minor child, James Arlynn Fox, have suffered and continue to suffer, through a prolonged period of domestic and emotional instability. The victim of these parental differences and legal entanglements is their five-year old son, the legal subject of these proceedings but also so obviously the pawn in collateral litigation and/or negotiations between the parties."

In awarding custody, the end sought is always the best interest of the child. In recognition of this aim we have on rare occasions placed custody in a third party rather than in the natural parents. This, however, has been done only where it has been conclusively established that both parents were unsatisfactory guardians. *Commonwealth ex rel. Basco v. Olson,* 173 Pa. Superior Ct. 319, 98 A. 2d 213 (1953); *Commonwealth ex rel. Shaak v. Shaak,* 171 Pa. Superior Ct. 122, 90 A. 2d 270 (1952); *Commonwealth ex rel. Sabath v. Mendelson,* 187 Pa. Superior Ct. 73, 143 A. 2d 665 (1958).

In an overwhelming majority of cases, however, we have been guided by our general presumption that: "Unless compelling reasons appear to the contrary, a child of tender years should be committed to the care and custody of its mother, by whom the needs of the child are ordinarily best served. . . . One of the strongest presumptions in our law is that a mother has a prima facie right to her children over any other person. . . ." *Commonwealth ex rel. Logue v. Logue,* 194 Pa. Superior Ct. 210, 215, 166 A. 2d 60 (1960).

After carefully reviewing the record, however, we can find nothing in this case which justifies our deviation from the above presumption. Indeed, the facts in this case require that custody of the child be retained by the natural mother.

James Fox was born to Gabrielle and Joseph Fox on May 23, 1963. In February, 1967, Mr. and Mrs. Fox separated, and the child remained in the custody of the mother, with the father exercising his right of visitation. On May 5, 1968, the father refused to return the child to the custody of his mother. On May 31, 1968, the mother filed a petition for writ of habeas corpus. After some confusion, the parties appeared in court and stated that they had reached an agreement that the father have permanent custody. No testimony was taken from the mother at that time.

On September 13, 1968, the mother petitioned the court to modify its order, alleging that she had been coerced into agreeing to the arrangement for custody by her husband's threats to remove the child to Canada. A hearing was held on September 23, 1968, and on November 26, 1968, the court filed its order directing that the child be delivered to the paternal aunt, which order was stayed pending disposition of this appeal.

As previously noted, the lower court's opinion does not set forth the considerations underlying its highly unusual decision to depart from established practice and award custody to the child's paternal aunt. Three arguments are advanced by the aunt in support of the court's action.

The first argument is that the mother was voluntarily admitted in 1964 to the Phil Haven Mental Institution in Lebanon County for a period of six weeks. There is no suggestion in the record, however, that the mother presently suffers from any prior mental problems.

The aunt next argues that the mother is immoral. The mother admitted that since the separation she has been dating a man whom she hoped to marry. She vigorously denied, however, that she had engaged in any immoral act. Furthermore, no evidence was presented to suggest that she had acted improperly.

It is significant in this regard that the lower court relied on *Commonwealth ex rel. Shipp v. Shipp,* 209 Pa. Superior Ct. 58, 223 A. 2d 906 (1966), for the proposition that the paramount consideration in custody cases is the welfare of the child. In *Shipp,* the mother deserted her husband, and with her child went to live with a married man. Although we characterized the mother's acts as "deplorable and . . . entitled to no sympathy," we still found that the best interests of the child would be served by allowing her to remain with her mother under the principles stated earlier. See also *Commonwealth ex rel. Jacobson v. Jacobson,* 181 Pa. Superior Ct. 369, 124 A. 2d 462 (1956); *Commonwealth ex rel. Gervasio v. Gervasio,* 188 Pa. Superior Ct. 95, 145 A. 2d 732 (1958).

Finally, the aunt argues that the mother was away from home all day as a result of her job. As will be demonstrated later, the child was not neglected or abandoned during this period. More importantly, however, such a consideration, if afforded any weight, would require the deprivation of custody to millions of working mothers whether happily married, separated, divorced or widowed. As our court stated in *Commonwealth ex rel. Lovell v. Shaw,* 202 Pa. Superior Ct. 339, 344, 195 A. 2d 878 (1963). "[A] mother should not be deprived of the custody of her child of tender years because she is compelled to work for a living."

Moreover, there is nothing in the record which would support the implication in the lower court's opinion that James has suffered as a result of being in his mother's custody.

The record clearly reflects that the mother is an intelligent, highly educated woman, who is employed as a Planning Processor, engaged in the development of new machinery for a tractor company. Her home is adequate for her son. When she leaves for work in the morning, James is left with a trained babysitter.

Moreover, for all but apparently fourteen weeks of his life, James has lived with his mother. The record on appeal now contains a letter dated July 24, 1969, from the Bureau of Children's Services in Lebanon County written in response to a request for a recommendation by the lower court judge. It should be noted that this letter was written eight months after the court's order. The letter states with respect to charges by the father of child abuse and inadequate physical and medical care: "None of these charges could be substantiated nor could this agency find evidence to remove the child for reasons of dependency or neglect. . . . We can find no evidence to show that James Arlynn Fox is receiving less than adequate care by his mother at this time."

Thus, there is nothing in the record which supports the uprooting of this child from his mother's home, where he has fared so well, to that of his paternal aunt. The aunt admits that she has lost contact with James during the past few years during which time she has only served as a babysitter on a few occasions. The child was in her home for only one extended six week period in 1964 and 1965, when the mother was in the hospital and the child was an infant. Thus, the court order serves to remove the child from the home of his natural mother where he is happy and well, to the unfamiliar surroundings of his aunt's home where his happiness and welfare cannot be assured.

In addition, we believe that the court failed to take into account the fact that the child will now be subjected to visitations by both the mother and father on

separate occasions. The introduction of the aunt into the child's life, therefore, can only serve to exacerbate an already confused situation by requiring the child to be passed among three households.

One more point should be noted. After approximately three quarters of the hearing had been completed, during the aunt's testimony, the court stated: "BY JUDGE GREINER: For the record, Miss Lavella, communications have been received and they are available to counsel from Mrs. Hartzell expressing her concern over the welfare of James and hoping that a proper and permanent home will be found for him and expressing a personal desire to provide that home, isn't that correct? BY MRS. HARTZELL: A. Right, sir. BY JUDGE GREINER: That is now on the record and I will file them with the papers so there is nothing undisclosed to counsel or the parties."

These "communications," however, upon which the court apparently relied, were never in fact made part of the record, and this court is not aware of their contents.

In short, we find no legal justification for the court's order in this case. On the contrary, we can envision great problems arising from the court's action in removing the child from his secure surroundings and placing him in a new, uncertain and untried environment. The presumption in favor of maternal custody should only be overcome in the most extreme of circumstances. It should never be ignored, however, where the facts, as in this case, point unquestionably to a contrary result.

In particular, whenever a judge does hereafter take such action, he should do so only after a full and complete explanation of the reasons underlying his decision, which reasons should be set forth in a complete, comprehensive opinion.

18

The order of the lower court is reversed and custody of the child is awarded to the mother.

WRIGHT, P. J., WATKINS and MONTGOMERY, JJ., would affirm on the opinion of GREINER, P. J.