Commonwealth ex rel. Spriggs *v.* Carson,
Appellant.

Argued March 12, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*J. Ross McGinnis,* with him *William C. Gierasch, Jr.,* and *Stock and Leader,* for appellant.

*Nevin Stetler,* with him *Stetler & Gribbin,* for appellee.

OPINION BY CERCONE, J., June 21, 1974:

Glenda L. Carson, the mother, appeals from the order of the lower court granting custody of her son to appellee, William M. Spriggs, Jr., the boy's father.

The facts of this case present an exhausting and enervating tug-of-war between a mother and a father over the custody of their boy, Jeffrey, in which both parties were on occasions guilty of precipitate and impetuous conduct relating to the custody of the child.

This melancholy narrative begins with the marriage of the parties in York County in 1964. Jeffrey, six and one-half years old, and Christine, 9 years old, are the children of this marriage. In 1968 and 1969, the mother became ill with a mental depressive condition, the result of marital difficulties and stresses, which caused her several times to threaten to take her life.

In February, 1970, the parties separated and the children remained with the father, the mother taking them on weekends and whenever she was needed. The mother testified in this case that this arrangement was in the best interests of the children since she had not

entirely recovered from the effects of her debilitating illness and because financially it was better for the children to stay with the father at that time. Under these circumstances the actions of the mother were justifiable and in no way jeopardized her position as the proper custodial parent for the children. *Commonwealth ex rel. Staunton v. Austin*, 209 Pa. Superior Ct. 187 (1966).

The parties were divorced in June of 1970 and the mother remarried on February 16, 1971. On May 5, 1971, having established a new home and feeling once again able to care for her children, the mother informed the father that she wanted custody of the children and on May 8, 1971, the parents discussed an arrangement under which the mother would have custody. The father said he wanted to discuss the matter with an attorney. On March 9, 1971, the mother had the children at a shopping mall in York when she met the father and began to discuss with him again the custody arrangement. The father, rather than meet and work out the problem that faced the family, gathered up the children, and after a physical struggle between the mother and father, he succeeded in getting the children into a car. On the same day he drove to his aunt's home in Florida and eventually to the home of his parents in Florida, where he still resides. Through a private investigative service, the mother learned that her children were living in Florida, and she filed an action in Florida for custody of the children. On February 1, 1972, an informal hearing in chambers was conducted by the Florida court attended by all the parties and their respective witnesses. At this hearing, a Dr. Dunlevy, psychologist, said there was hostility between the mother and her daughter, Christine, and although the mother and her present husband, Mr. Carson, were not called by the judge to testify, the court entered a temporary order awarding custody to the father with

"abundant visitation" to the mother while she was in Florida, and during the summer months upon her return to Pennsylvania. The order provided for a review of the matter after the 1972 summer visitation. The mother visited with the two children on the evening of the hearing. During the next several days, a conflict arose between the mother and her mother-in-law at whose home the children were staying. The mother-in-law, Mrs. Spriggs, would not permit the mother to either see or visit with her daughter Christine. Mrs. Spriggs contended that because there was an estrangement between the mother and the daughter which caused the daughter to become upset, distraught and unwilling to see her mother, she refused to allow the mother to visit with her daughter. Under these circumstances, several days after the hearing the mother left for Pennsylvania with her son Jeffrey. As a result of this action on the part of the mother, the mother was found in contempt of the Florida court. After she returned to Pennsylvania the mother stayed briefly in York County, at her mother's home in Indiana County, and at the home of her new mother-in-law in Ohio, before coming back to her residence in Lancaster County.

The father began proceedings for the custody of Jeffrey in York County, and the mother voluntarily appeared for the hearing. The hearing began on October 18, 1973, and on February 26, 1974, the court granted custody of Jeffrey to the father. We disagree with the lower court's decision and reverse.

The lower court has castigated and characterized the mother's efforts to gain custody of her children as amoral. Although we, too, do not condone her action in violation of the Florida court order, we find this description by the lower court harsh and unwarranted in the light of the father's equally rash conduct in this case. Instead of facing the problem of custody with his wife in May of 1971 when they met at the shopping

mall in York, he whisked the children to Florida because as he testified, it was his understanding that in Pennsylvania a mother was favored over the father in child custody cases. He, in effect, began the destructive process that has worked such havoc and travail in the life of his children. Prior to May of 1971 he was in custody of his children, and the mother had regular week-end visitations so that the continuity of mother-father relationships continued for the children. But when he took them away so suddenly, and in so drastic a manner, it could not have had other than a traumatic impact on the children. However, in this type of case where parents attempt to outwit each other in the possession and custody of their children, we will not place much weight on the frailties of human nature, nor subordinate more important factors, especially since those regrettable acts on the part of the parents are in the past. We are interested in the present situation as it exists and as it relates to the best interests of the children. *Commonwealth ex rel. Thomas v. Gillard,* 203 Pa. Superior Ct. 95 (1964).

The present situation is as follows: The mother now has a well-established home in Lancaster County. Her present husband, Robert Carson, is an accountant and an officer of a corporation. His income at the time of the hearing was $16,000. The house contains three bedrooms, a dining room, living room, a large kitchen and two and one-half baths. Their home is situated in what is apparently a lovely location in Lancaster County, having all the convenience of city life with a country atmosphere. A farm adjoins their home where Jeffrey can enjoy a stream in which to fish, trees to climb, and plenty of space for him to run and frolic. Within the complex where the home is situated there is a tennis court, a golf course, and several playgrounds for the use of the children.

The mother took a three-month course in parental training techniques, which has helped her tremendously. She decorated her son's room herself, painted the furniture and continues to do a great deal of artwork that she places in Jeffrey's room which contains some of his favorite toys: a toy soldier, standing guard over his bed; a big drum; a crocheted humpty dumpty doll which he always wanted on his bed; and, an aquarium. The mother makes many of Jeffrey's clothes. She and her present husband take Jeffrey skating, bicycling, golfing, swimming and to play tennis. They read together, and Jeffrey has become quite "a little artist." Her present husband has developed a fine relationship with Jeffrey. Together they attend football games and go fishing, tree climbing, hiking and picnicking. The mother is full-time homemaker who has now, as the lower court found, been restored to good health.[1]

Jeffrey has been trained in self-discipline. He has been given an assignment of chores such as taking out and emptying the trash, and cleaning his own room. At first a little strange when he came to live with his mother and her new husband, Jeffrey now is able to communicate his problems and finds himself in the atmosphere of a normal, healthful and tranquil home.

Jeffrey needs corrective shoes for a congenital foot condition, and was wearing such shoes when taken by his father to Florida. While in Florida his father did not consult an orthopedist nor did he provide corrective shoes for Jeffrey. Under his mother's care Jeffrey is again wearing corrective shoes under the advice of an orthopedist. She attends to his dental care, booster shots and other health needs.

Dr. Allen Greenstein, Psychologist, found Jeffrey to be a typical six-year old, with no presence of a "diag-

---

[1] This conclusion was based upon the testimony of a psychiatrist, and was not contested by the father.

nosible category." He has an intellectual potential within the bright/normal range. These findings were the result of a Wexler Intelligence Scale for children, projected drawing techniques, and the Rorschach Ink Blot Test. The psychologist found that Jeffrey enjoys the people he is with and his needs are being met. Dr. Greenstein also interviewed the mother and Mr. Carson; and, his evaluation of the relationship between the mother, Mr. Carson and Jeffrey, was that the family life was cohesive, integrated and happy. When the psychologist asked Jeffrey to whom Jeffrey was relating when Jeffrey said "daddy" or "father," the psychologist found that the boy was referring to Mr. Carson. The psychologist found that Jeffrey is in an atmosphere that promotes his continued growth and seems to be emotionally warm and responsive. Upon cross-examination Dr. Greenstein said sending Jeffrey back to the father would be harmful, because it was time to stop the shuttling of the child. There were ten witnesses who testified that the mother's home was happy and well coordinated.

If Jeffrey is returned to his father, his grandmother, Mrs. Spriggs, will in effect be his "mother." Although we are certain that Jeffrey's paternal grandparents are good people and would do everything possible to make life comfortable for Jeffrey in a well ordered home, this cannot compare with the love, affection, and care which can be given to Jeffrey by his natural mother who, on the record of this case, has demonstrated a deep love for her son.

We certainly will not caustically characterize the father in this case, but only state that his actions were no more nor less undesirable than the mother's in shuttling the children back and forth between them. And as we said, on a record which demonstrates undesirable conduct on the part of both parents, we can only decide

this case on other factors. *Commonwealth ex rel. Thomas v. Gillard,* supra.

Even where misconduct by one parent was found, so long as the lapse from accepted standards did not involve the treatment and care of the children, the court overlooked that impropriety by the parent. In *Commonwealth ex rel. Logue v. Logue,* 194 Pa. Superior Ct. 210 (1960) it was proved that the mother of the children whose custody was being sought had given birth to an illegitimate child since her divorce from the father. However, the court awarded custody of the children to the mother, stating that: "Although this conduct was certainly reprehensible, the accepted rule in cases of this kind is that a lapse from moral standards is not a controlling factor where the parent is not otherwise at fault and where the lapse does not involve the treatment and care of the children." The misconduct of the mother as evidenced in this case in no way involves the treatment and care of Jeffrey. In fact, on the basis of this record, and considering Jeffrey's age, no better reason can be set forth for placing custody in the mother than that expressed in the very recent case of *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352 (1973) where the Pennsylvania Supreme Court set forth succinctly the rule regarding the welfare of a child of tender years as being best promoted by giving his custody to his mother: "In Pennsylvania, supported by the wisdom of the ages, it has long been the rule that in the absence of compelling reasons to the contrary, a mother has the right to the custody of her children over any other person, particularly so, where the children are of tender years. See *Commonwealth ex rel. Fox v. Fox,* 216 Pa. Superior Ct. 11 (1969); *Commonwealth ex rel. Krause v. Krause,* 185 Pa. Superior Ct. 167 (1958); and *Commonwealth v. Addicks,* 5 Binn. 520 (1813). In fact, that the best interests of children of tender years will be best served

under a mother's guidance and control is one of the strongest presumptions in the law." *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. at 355. See also *Commonwealth ex rel. Logue v. Logue,* 194 Pa. Superior Ct. 210 (1960).

Furthermore, "only unusual circumstances will justify placing a child beyond the jurisdiction of the court." *Commonwealth ex rel. McLeod v. Seiple,* 193 Pa. Superior Ct. 131 (1960); *Brown v. Brown,* 206 Pa. Superior Ct. 439 (1965). In *Shoemaker Appeal,* 396 Pa. 378 (1959), the Supreme Court said: "If all other factors are approximately equal, the Courts should prefer a resident to a non-resident guardian and custodian, since the former is more amenable to the Court's continuous watchful eye, supervision and control." If we were to return Jeffrey to the custody of the grandmother in Florida we would be inviting a repetition of the conflict between mother and mother-in-law which resulted as an aftermath of the Flordia hearing. Jeffrey and his sister have had enough of such traumatic activity.

We find there is no way that Jeffrey's home life can be improved by placing custody of him in his father. The deep and abiding relationship which Jeffrey, still in his tender years, now has with his mother and his stepfather speaks eloquently of a wholesome, healthful and bright future for Jeffrey.

The order of the lower court is reversed and custody of Jeffrey is placed in his mother, Glenda L. Carson. This case is remanded solely for the purpose of having the lower court decide what visitation rights are to be given the father with appropriate security to guarantee that Jeffrey will be returned according to the schedule to be set by the lower court.

HOFFMAN, J., did not participate in the consideration or decision of this case.

DISSENTING OPINION BY PRICE, J.:

This custody case involving the parties' young son, Jeffrey, 6½ years old, presents, like all other matters involving young children, a heart-rending and difficult choice. The courts attempt to solve these disputes where the parties cannot through time-tested and well-established doctrines of law and, although I must disagree with the majority's conclusion, I do not disagree with the principles that are cited therein. It is in the application and weight to be given these principles, under the facts and circumstances herein presented, that I depart from the holding of the majority.

The factual narrative in the majority opinion is accurate, and I agree that there is no desire to castigate or characterize either of the parties in their efforts to gain custody of this child. I accept the efforts on behalf of both parties as motivated by a bona fide interest and love of the son involved.

Nevertheless, I believe that the majority opinion places too much emphasis on the application of the tender years doctrine, and I would conclude that the child's intellectual, spiritual and emotional well-being in this instance outweighs the tender years doctrine and requires an affirmance of the lower court's decision. This is particularly so if you accept the tender years doctrine to be merely a vehicle through which a decision respecting a child's custodial well-being may be reached where factual considerations do not otherwise dictate a different result. I agree with the lower court that in the present case Jeffrey's well-being and best interests dictate custody in the father.

I am also concerned and give consideration to the fact that two very able judges have considered the problem herein presented and both have reached the same conclusion, that is, that the best interests of this child are served by awarding custody to the father. It is certainly true, as recognized by the lower court and by

the majority opinion, that we are not bound by the decision of our sister state, Florida; but I do not think it appropriate to ignore the effort and consideration given to this custody matter by the Florida court. I am also very much impressed by the very thorough and comprehensive hearing conducted by the lower court here and the very able and well-reasoned opinion rendered by the lower court.

While it is our duty to examine the evidence in custody cases, we are not free to nullify the fact-finding function of the hearing judge, who can best determine the credibility and the weight to be given to the testimony of the witnesses who appear before him.

Taken as a whole, this very adequate record and able consideration by the lower court is more than sufficient, in my view, to support the lower court's ruling. The burden is upon the appellant, in this case the mother, to establish that the order of the lower court is erroneous, or it is based upon error of law, and I am satisfied that this burden has not been met.

I further believe that the majority opinion uses the sword of Solomon to further divide an already torn family. It has long been recognized as a policy in the law of the Commonwealth of Pennsylvania that it is desirable to keep brothers and sisters together and, although it standing alone may not necessarily be determinative, it is an important factor in this case that consideration should be given to the raising of Jeffrey, the child herein involved, with his sister, Christine, who is 2½ years older and remains in the custody of the father.

For these reasons, I would affirm the order of the lower court.

SPAETH, J., joins in this dissenting opinion.