395 A.2d 279

Theresa A. BENDER

v.

Kenneth O. BENDER, Jr., Appellant.

Superior Court of Pennsylvania.

Argued June 16, 1978.

Decided Nov. 3, 1978.

William J. Litvin, West Chester, for appellant.

H. Joseph Flynn, Lancaster, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

After having once awarded custody of a now six year old girl, Heather, to her father, the lower court then awarded custody to her mother. We reverse and remand for both procedural and substantive reasons. As a matter of procedure: the lower court made the change in custody on the basis of evidence not in the record; also, we do not have the comprehensive opinion that we must have in a custody case. As a matter of substance: the evidence that is of record strongly suggests that the court's earlier award of custody to the father was in Heather's best interest.

It is settled that the paramount concern in a custody dispute between parents is the best interest of the minor child. *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 107–08, 296 A.2d 625, 627 (1972); *Cochran Appeal,* 394 Pa. 162, 145 A.2d 857 (1958); *Commonwealth ex rel. Graham v. Graham,* 367 Pa. 553, 80 A.2d 829 (1951); *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973). " 'Under both the statutory and case law, the scope of our review in child custody cases is quite broad and, while we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding which has no competent evidence to support it.' " *Commonwealth ex rel. Grillo v. Shuster, supra,* 226 Pa.Super. at 235, 312 A.2d at 62, quoting *Commonwealth ex rel. Gifford v. Miller,* 213 Pa.Super. 269, 273–4, 248 A.2d 63, 66 (1968). Further, we are not bound by inferences or deductions made by the hearing judge from the facts found. *Commonwealth ex rel. Bowser v. Bowser,* 224 Pa.Super. 1, 302 A.2d 450 (1973). To enable us to exercise this quite broad review, "the hearing judge should file in every custody case a comprehensive opinion reflecting a thorough analysis of the record as a whole and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster, supra* 226 Pa.Super. at 237, 312 A.2d at 63. *And see Commonwealth ex rel. Holschuh v. Holland Morritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976).

In order to apply these principles it will be helpful to state the case in several parts, one part for each of the lower court's successive orders.

–1–

Heather's parents were married in 1972 and separated in August 1976. Upon separation, the mother filed a petition for permanent custody of Heather. A hearing was held on September 9, 1976. The mother testified that she is a nurse's aid, working from 7:00 a. m. to 3:30 p. m., with four days off every two weeks. "Every now and then," she said, she works the second shift from 3:30 to midnight. N.T.

36a.* She explained that she and Heather live with her parents and her two teenage brothers at her parents' house; when she is working, her sister, Marjorie Seymour, who has her own small child, babysits for Heather. She said that she has "complete faith and trust" in her "sister's ability to care for Heather." N.T. 37a. She complained that when they lived together, her husband (Heather's father) had slapped her on a few occasions, that once he had closed her in a closet, and that he used to twist her arm to make her do as he wanted. N.T. 22–24a. She also accused her husband of never bathing Heather or changing her diapers, or punishing Heather with a fly swatter, of once throwing a shoe at Heather, and of once threatening to break Heather's back if she and Heather did not return to him. N.T. 25a, 28a, 30a. She admitted that she too had used the fly swatter to punish Heather. N.T. 39a. She acknowledged that once when she went with her parents to pick Heather up at her husband's apartment, her mother had carried a pistol, because, she said, her husband had previously threatened her. N.T. 45a. She also admitted that she has taken various items, such as scissors, hemostats, and tissues, from the hospital where she works. N.T. 49a.

Heather's father, a mechanic who now lives with his parents, denied that he had been violent towards his wife or Heather, although he admitted that he had once slapped his wife. He also admitted that on occasion he lost his temper and hollered, but, he said, no more than his wife. He said that both he and his wife had used a fly swatter on Heather, but he denied that he did not bathe or change Heather's diapers with sufficient frequency. (He said that sometimes when his wife returned from the late shift, and he was already in bed, she would find Heather unchanged.) He complained that his wife had shown indifference to Heather's welfare in that whenever she came to leave Heather with him, she would speak in a "constant string of profanity," N.T. 70a, and when he came to pick Heather up for weekends, he found bruises on her armpits, arms, legs, and

* The references to the transcript are to the reproduced record.

buttocks. N.T. 73a. (He admitted, however, that he had no proof that the bruises were not the result of "the child falling down." N.T. 96a.) He related one incident when Heather was ill and supposed to take medication. According to him, when his wife came for Heather it was raining and Heather was not wearing shoes or a jacket, but when he tried to explain the situation, his wife just cursed and "tried to pull [Heather] right out of my arms and take her out into the rain dressed as she was." N.T. 76a. The father also said that his wife has not had a good relationship with her own parents in the past, that she told him that they had neglected her medical needs as a child, and that she usually referred to her parents in derogatory terms, once even saying that she did not want them to see Heather at all. N.T. 69a. He said his wife's sentiments in regard to her sister were even stronger. "She's called her every conceivable name that you can come up with: Bastard, anything along this line; a slut, animal, a whore . . .. She would not let her name be used in the house." N.T. 85a. He related several unsavory incidents that the sister was allegedly involved in, and claimed that his wife had told him that her sister and her husband "break into homes" and had on one occasion "attempted to run her off the road, and her sister's husband fired a shot at them." N.T. 87–88a.

Two of the father's friends testified on his behalf. They said that they used to visit the couple's home once a week. They corroborated the father's testimony in regard to the mother's profanity and her criticism of her parents and sister, and also in regard to the mother taking Heather out into the rain, Heather having bruises on her body, and the mother having said she had taken things from her employer. See N.T. 102–122a.

At the conclusion of the hearing the court awarded custody of Heather to the mother, with visitation to the father. The court also ordered that Marjorie Seymour, the mother's sister, not babysit for Heather any more. The court made no findings, and did not explain its decision. No appeal was taken. If an appeal had been taken, and in response an

opinion had been filed, it is easy to imagine that we would have affirmed, for it would appear that the parties' respective allegations could only be resolved by a determination of credibility, on which we defer to the lower court. *Commonwealth ex rel. Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977); *In the Interest of Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976); *Clair Appeal*, 219 Pa.Super. 436, 218 A.2d 726 (1971). However, the dispute regarding Heather's custody continued.

–2–

In November 1976, the father filed a petition asking that the mother be held in contempt for disobeying the order that Marjorie Seymour should not babysit for Heather, and also for turning Heather against him. A hearing was held on December 9, 1976. The father testified as follows:

A. I would take the child and the clothes that she had thrown out to me and tried to get to the car and the child continued to scream and holler that she hated me, Daddy didn't love me, Mommy told her that Daddy doesn't love her and she doesn't get proper treatment or care from me or something along that line because she hated me, that I hurt Mommy. It was a repetitious thing like that. Almost every time I have come to pick up the child. N.T. 158a.

He also claimed that Heather had started to use profanity, that Marjorie Seymour was still babysitting for Heather, and that Heather told him that "she didn't want Marjorie to watch her because she bit her finger." N.T. 172a. The father's parents corroborated his testimony and his mother added. "She [Heather] doesn't want to go to church because she [the mother] gave her a picture of Jesus and the child calls it a bugger and that is something she is afraid of." N.T. 182a.

The mother denied the father's accusations, complained that he turns Heather against her, and that when Heather returns from visits with him she and her clothes are dirty. She claimed that Marjorie Seymour only babysat for Heath-

er for one night, and that she has a new babysitter, one Wanda Evans. The mother's mother corroborated her testimony; it also appeared that Marjorie comes to visit at her house at least three times a week.

At the conclusion of this hearing the court stated that it was "not fully convinced" that the mother had violated its prior order by allowing Marjorie Seymour to babysit. The court found that there was "credible evidence" that the mother was turning Heather against the father and was teaching her profanity, and that perhaps the father had retaliated. The court warned both parties of the consequences of continuing such behavior. Otherwise, the court took no action.

–3–

In January 1977, the father filed a petition for custody of Heather. A hearing was held on February 2, 1977. The father testified that his wife was no longer living at her parents' house but in a trailer park at the trailer of one Ruth Vanesky, who is separated from her husband and lives in the trailer, with one double bed and one bunk bed, with her two sons. The father said that Heather told him that "there were times when she was forced to sleep on sofas and chairs, that during her stay there she slept in the same bed with my wife and some guy named Jerry, three of them." N.T. 239a. He claimed that "[t]his trailer court is noted for narcotics, prostitution, any of a number of things of that order. There have been occasions when there was gunfire out of the back of trailers. Stolen goods have notoriously showed up there quite regularly." N.T. 244a.

The father further testified that when he had custody of Heather on the weekend of January 22, his mother found that Heather had three, deep, three and one half inch "welt-type bruises" on her buttocks. N.T. 233a. He described the bruises as follows:

Q. Would you indicate for the record how long they were in inches?

A. I'd say three, three and a half inches at least.

Q. How many of them were there?

A. There were two on one side and one on the other.

Q. You mean two on one side of her rear end and two on the other?

A. There was like one had continued all the way across her rear and the other one was across one side of her leg on the lower buttocks.

Q. Would you describe the color of these marks?

A. Very dark, almost coffee colored.

N.T. 233–34a.

The father described other bruises on Heather as follows:

A. From the knees down there was a mass of bruises. It's been continuous since my wife took custody of the child that my daughter—every time I have picked her up with the exception of possibly two or three weekends that she has been a mass of bruises all from her knees to her feet was just constant bruises, continually.

N.T. 235a.

The father said that he had called a Pastor Paul Sitler, who had arranged for a medical examination, and that the doctor had recommended that Child Abuse in Harrisburg be notified. N.T. 334–35a. He also said that Heather had told him that "Big Roger" had hit her with a stick (he did not know who "Big Roger" was, N.T. 236a), and that when Heather slept at his house she would wake up between 2 and 4 o'clock in the morning and run through the house looking for him because she was afraid. N.T. 250a. Pastor Sitler corroborated the father's testimony in regard to the trailer park's reputation, and the bruises, and Heather's complaints about "Big Roger" and men sleeping in the trailer with her and her mother. He added that Heather told him that her mother hits her with her hand and that she wanted to stay with her father. ʻN.T. 272–74a.

The mother denied that she had moved in with Ruth Vanesky, but admitted that in the past two months she had stayed overnight "maybe twenty" times. N.T. 292a. She

denied knowing anyone named Jerry, but said that "Big Roger" is the husband of Wanda Evans, the babysitter, who also lives in the trailer park. N.T. 294a. She testified that she never saw the welts. N.T. 298a. Ruth Vanesky and Wanda Evans testified that they had not hit Heather, and had not seen bruises on her, N.T. 326a, 336a, and Ruth Vanesky denied that she had ever had a man sleep over in the trailer when Heather and her mother were there. N.T. 350a.

At the conclusion of the hearing the court found that there was "credible evidence" of some child abuse over the weekend of January 22, and ordered the Bureau of Children Services to make an investigation and to report to the court, stating, however, that as no more testimony was necessary, when the court received the report, it would enter a final order. The court then awarded custody of Heather to the father, and directed that Wanda Evans was not to babysit for Heather any more.

Although, again, we do not have the benefit of detailed findings, it appears that the court's award of custody of Heather to her father was amply supported by the record. The only disinterested witness, Pastor Sitler, corroborated the father's testimony in regard to the bruises, the life at the trailer park, and Heather's fears and preference. The mother did not deny that she spent substantial time at the trailer park but merely that she had moved there permanently. The record also reveals that the mother seems unable to find satisfactory supervisory care for her child. Both of her parents work. Her first choice—her sister, Marjorie Seymour—was found by the court to be unacceptable; yet because of their familial relationship, Heather still spends much time in the company of Marjorie Seymour and her husband. The mother's next choice—Wanda Evans—is married to a man who, allegedly at least, hit Heather, and who was also found by the court to be unacceptable. Therefore, whether or not the mother teaches Heather profanity and to hate the father, and whether or not she is capable of raising Heather, she appears to have shown little concern for Heather's needs during the time when she cannot care for

Heather—which is most of the time—indeed, to have shown so little concern for Heather that she either did not notice the bruises on Heather's body, or chose to ignore them.

It is true that we do not know as much about the father as we should. The lower court did, however, have evidence indicating that the father lives in a stable environment, with his parents. His siblings are married and live elsewhere so that if her were to have custody of Heather, she would have her own room. While the father is at work, a Mrs. Kelly, who babysat for Heather when her parents lived together, would take care of Heather. It is also true that the mother accused the father of various wrongdoings. However, the accusations are uncorroborated, and, as mentioned, the lower court made no detailed findings.

–4–

Accordingly, up to this point—that is, up through the last hearing, on February 2, 1977—the record strongly suggests that it is in Heather's best interest to be in her father's custody, as the lower court directed by its order entered at the conclusion of the hearing. However, on April 18, 1977, the lower court reversed its order and once again awarded custody of Heather to her mother, and it is this order that is before us on appeal.

■ As stated at the outset, there are both procedural and substantive reasons that require reversal and remand. The substantive reasons have just been explained: as the record stands now, it strongly suggests that it is in Heather's best interest to be in her father's custody—not her mother's. This conclusion leads to the procedural reasons, which are as follows.

■ Apparently the lower court was persuaded to change its award of custody to the father because of something in the investigative report, which it had ordered from the Bureau of Children's Services. However, the court did not make this report part of the record. We are therefore unable to review the report and thereby discharge our appellate responsibility. *Gunter v. Gunter, supra, Commonwealth ex rel. Grillo v. Shuster, supra.*

■ In this regard, we are not assisted by the opinion of the lower court. After briefly describing the three hearings, the court notes that it ordered that Heather should remain with the father "pending a report the Court ordered from the Bureau of Children's Services . . . ." The court then briefly alludes to some of the testimony. In the course of doing so, the court states that it was difficult to determine who caused Heather's use of profanity, and also that the bruises were not severe and might have resulted from play or "from some slapping or punishment by the mother." The court then finds that the homes of both parents are satisfactory, and the income of both parents adequate, and that "the child would be well cared for in either home." The court concludes by saying that Heather's best interest will be served by an award to the mother, with liberal visitation to the father, for the following reason:

> The mother, while working, lives in a stable and wholesome atmosphere and the report of the Children's Bureau indicates a genuine love and affection of the mother for her child, and we feel the child's welfare will be advanced in the household of the mother who has impressed the Court with her sincere desire to care for and properly raise the child.

The opinion does not represent "a full and complete explanation of the reasons underlying his decision, which reasons should be set forth in a complete, comprehensive opinion." *Commonwealth ex rel. Fox v. Fox*, 216 Pa.Super. 11, 17, 260 A.2d 470, 472–73 (1969). *And see* cases cited *supra*. Moreover, it is not supported by the record, to the extent that we have the record; whatever was in the investigative report, the transcribed testimony does not suggest that the mother lives in a "stable and wholesome atmosphere."

Sometimes, when an award of custody has not been explained, we have remanded for further review. *See Gunter v. Gunter, supra; Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974); *Commonwealth ex rel. Grillo v. Shuster, supra*. Other times, we have found remand unnecessary because the record makes it clear where the child's best interest lies. *See Tomlinson v. Tomlinson*,

248 Pa.Super. 196, 374 A.2d 1386 (1977); *Sweeney v. Sweeney*, 241 Pa.Super. 235, 361 A.2d 302 (1976); *Commonwealth ex rel. Foster v. Foster*, 225 Pa.Super. 436, 311 A.2d 663 (1973) (Concurring Opinion). Here, it might appear that the case falls into the second category—that the record, as we have it, is clear, and that we should simply reverse and award custody of Heather to the father. Especially might this conclusion be reached, given the lower court's finding that the father's home and income were satisfactory, and that Heather would be well cared for by him. Even so, we do not know what the investigative report contained; yet it was apparently sufficiently impressive to cause the lower court to reverse its earlier award.

Given these circumstances we reverse the order of the lower court and remand with instructions to make the investigative report of record; to afford counsel the opportunity to argue the significance of the report, and to offer evidence to support or rebut it; and then to enter a new award of custody, to be accompanied by a comprehensive opinion specifying the reasons for the award.

VAN der VOORT and HESTER, JJ., dissent.

HOFFMAN, J., did not participate in the consideration or decision of this case.