501 Pa. 472 (1983)
462 A.2d 221
COMMONWEALTH ex rel. Alfred A. DAVENPORT
v.
MONTGOMERY COUNTY CHILDREN AND YOUTH SERVICES and Joseph Zdun and Ada Zdun, h/w and Kathy Ann Davenport.
Appeal of Joseph and Ada ZDUN, h/w.
Supreme Court of Pennsylvania.
Argued May 26, 1983.
Decided July 8, 1983.
*473 Catherine Miraglia Lecky, King of Prusia, for appellant.
Norman A. Klinger, Francis T. Dennis, Jr., Norristown, for appellees.
Before ROBERTS, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

OPINION OF THE COURT
FLAHERTY, Justice.
This is an appeal from an order of the Superior Court reversing a custody award entered by the Court of Common Pleas of Montgomery County in favor of the maternal grandparents with visitation rights in the father. Superior Court reversed, ruling that custody should be awarded to the natural father and remanding the cause to the lower court to set appropriate visitation rights for the grandparents. The grandparents sought review by this Court which was *474 granted, and, for the reasons that follow, we reverse the order of Superior Court, 305 Pa.Super. 545, 451 A.2d 781 (1982), and reinstate the hearing court's order.
Kathy Ann Davenport was born January 16, 1977, the daughter of Kathy and Alfred Davenport. Marital difficulties resulted in the separation of the Davenports in June 1978 whereupon mother and Kathy Ann moved into the home of the maternal grandparents, the Zduns. The Davenports were subsequently divorced on December 6, 1979.
In April 1979, Kathy Ann and her mother moved into an apartment; they were joined there in December, 1979 by the mother's boyfriend. On January 17, 1980, on confirmed reports of child abuse, Kathy Ann's mother signed a voluntary placement agreement giving custody of Kathy Ann to Children & Youth Services of Montgomery County (hereafter "CYS"). That agency placed Kathy Ann with her maternal grandparents.
After discovering Kathy Ann's residence with the grandparents, the father filed a petition seeking visitation on March 25, 1980. He visited Kathy Ann on four occasions through June, 1980. On May 14, 1980, the father filed a petition seeking custody; the mother intervened as an interested party and the grandparents cross-petitioned for custody. Following hearings, the father was awarded temporary custody, with partial custody in with the mother, Kathy Ann alternatively spending three days with her father, and three days with her mother. During the periods of partial custody of the mother, Kathy Ann usually stayed with her maternal grandparents.
During this period of shared custody, Kathy Ann appeared unhappy and developed nervous symptoms attributed to the constant shifting between households. All parties agree the child has not flourished under this arrangement. Kathy Ann's changed condition precipitated the instant petition of the grandparents for custody.
The hearing court found the best interests of Kathy Ann to be served by placing her in the custody of her *475 grandparents. This conclusion was based on the following facts, which have ample support in the record. Kathy Ann was familiar with her grandparents, as she had stayed at their residence during the periods of partial custody of the mother and almost every weekend prior to the separation of the parents. In contrast with the father's two bedroom apartment with accompanying yard space, the grandparents' home is quite spacious. One bedroom is equipped for Kathy Ann, and another room is a toy room. While there are no other children in the father's neighborhood, there are children in the grandparents' neighborhood with whom Kathy Ann has played, and a school is situate within three blocks of the grandparents' home. Mrs. Zdun, the grandmother, is a housewife and homemaker, who testified she would devote herself to the care of Kathy Ann on a full-time basis. The grandmother understands the responsibility and work involved in raising a four-year old child, as she cared for Kathy Ann during the first seven months of 1980. Although little weight was given to the child's preference, Kathy Ann did express a desire to stay with her grandparents.
In December 1980, the grandmother discovered bruises on Kathy Ann's body. Further examination by Dr. William Holmes, a pediatrician, confirmed the presence of linear bruises on the buttocks, which were consistent with Kathy Ann's statement she had been spanked by her father with a belt. Dr. Holmes opined that excessive force had been used in punishing little Kathy Ann; however, a caseworker from CYS concluded the father's treatment of Kathy Ann did not rise to the level of abuse. In connection with these bruises, the father testified that on a Sunday morning he and his fiancee, Gail, were awakened by Kathy Ann at approximately 7:30 a.m. because she wanted to go to the bathroom. Kathy Ann was directed to go alone to the bathroom which was located on the lower floor of the apartment. Kathy Ann returned to bed at her father's direction because he and Gail wanted to sleep. When Kathy Ann persisted in her attempts to get out of bed, her persistence was met by the father's insistence she stay in bed "so she would learn to *476 listen". This contest of wills culminated in three spankings, two by the father and the third perpetrated by Gail using a wooden spoon, and in Kathy Ann's being locked in her room. The hearing court concluded this incident demonstrated little maturity in the father, stating, "Given the fact that only a year earlier Kathy Ann had been abused by her mother's boyfriend, [the father and Gail] showed little understanding in this four hour `lesson' which only served to terrify the child."
Although unemployed, the father has insisted Kathy Ann attend day care school for approximately ten hours each day, from 7:30 or 7:45 a.m. until 5:20 p.m. "so she could learn to play with other children and to be a little girl." The father's placement of Kathy Ann in a day care center for approximately ten hours per day, coupled with the fact that during his lengthy separation from Kathy Ann prior to July 1980 the father only saw Kathy Ann about five times led the hearing court to conclude the father's interest in Kathy Ann is "questionable." Superior Court rejected this conclusion, on the theory that appellate courts are not bound by the conclusions or inferences drawn by the hearing court. Although we have held that the scope of review in custody matters is of the broadest type, and appellate courts are not bound by deductions or inferences made by a trial court, nevertheless, appellate courts "may not, and in fact cannot, substitute their own findings of fact with respect to the parties' emotional feelings and attitudes towards one another," Commonwealth ex rel. Zaffarano v. Genaro, 500 Pa. 256, 263, 455 A.2d 1180, 1183 (1983), and this is so because being personally exposed to the witness's demeanor, the hearing judge is in the best position to determine sincerity and truthfulness in this regard. Thus, Superior Court's rejection of the lower court's factual determination and substitution of its own conclusion constituted impermissible appellate fact finding on this record.
The hearing court's determination that the maternal grandparents will provide a stable and loving home which will serve Kathy Ann's best interests is amply supported by *477 the record and should not be disturbed. Therefore, we reverse the order of the Superior Court and reinstate the order of the Court of Common Pleas of Montgomery County.
Reversed.
NIX, J., did not participate in the consideration or decision of this matter.