472 A.2d 635

**In re DONNA W. and Edward W., Minors.**

**Appeal of MARILYN W., Mother of the minor children.**

Superior Court of Pennsylvania.

Argued May 10, 1983.

Filed Feb. 10, 1984.

Petition for Allowance of Appeal Denied Sept. 4, 1984.

Eileen D. Yacknin, Pittsburgh, for appellant.

Marc Salo Drier, Pittsburgh, for appellees.

Timothy W. Pawol, Pittsburgh, for participating party.

Before CERCONE, President Judge, and SPAETH, HESTER, BROSKY, WIEAND, BECK and JOHNSON, JJ.

SPAETH, Judge:

This appeal by a mother seeking custody of her children presents two questions. The first question is: What is the scope of our review in a child custody case? The answer to this question is long-settled; it is: The scope of our review is broad; we must accept the trial court's findings of fact, unless they are unsupported by the evidence, but on those facts we must make such order as our independent judg-

ment persuades us right and justice dictate. The second question is: On the facts of this case, as the trial court has found them to be, what order do right and justice dictate? While we acknowledge that the answer to this question is very difficult, we have concluded that the children should remain with the foster parents, but that appropriate steps should be taken to ensure that the mother will receive training and support, in the hope that after continued contact with the children and further enhancement of her abilities as a parent, she may be awarded custody. We therefore affirm the trial court's award of custody to Allegheny County Children and Youth Services, but remand for further proceedings.

–1–

–(a)–

By way of clearing the ground, it should be noted at the outset that it is pointless to try to reconcile the decisions of this court. While some members of this court have insisted that the scope of review in custody cases is broad, other members have insisted that it is narrow, and that we should reverse only if the trial court has abused its discretion. The intensity and duration of this struggle may no doubt be explained by the depth of the emotions evoked by child custody cases. Nevertheless, whatever may be the law in other jurisdictions, the law in Pennsylvania is long-settled, and we should do well to accept it as settled, and cease struggling to escape the responsibility—admittedly, difficult and painful to fulfill—that it imposes upon us.

■ The Pennsylvania Supreme Court has succinctly defined the scope of review in child custody cases:

Our scope of review in a custody matter is of the broadest type, and we are not bound by deductions or inferences made by a trial court. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 295, 368 A.2d 635, 637 (1977). We must exercise an independent judgment based on the evidence and make such an order on the merits of the case as right and justice dictate. *Adoption*

*of Farabelli,* 460 Pa. 423, 433, 333 A.2d 846, 851 (1975); *Snellgrose Adoption Case,* 432 Pa. 158, 163 247 A.2d 596, 599 (1968).

*Commonwealth ex rel. Pierce v. Pierce,* 493 Pa. 292, 295–297, 426 A.2d 555, 557 (1981).

Relying on this and other, similar, statements, this court has said:

It is clear that our scope of review in custody cases is of the broadest type. *Commonwealth ex rel. Pierce v. Pierce,* 493 Pa. 292, 426 A.2d 555 (1981); *Commonwealth ex rel. Oxenreider v. Oxenreider,* 290 Pa.Super. 63, 434 A.2d 130 (1981); *Commonwealth ex rel. Berman v. Berman,* 289 Pa.Super. 91, 432 A.2d 1066 (1981). We are required to exercise independent judgment based on the evidence and make such an order on the merits of the case as to do right and justice. *Commonwealth ex rel. Pierce v. Pierce,* supra; *Commonwealth ex rel. Oxenreider v. Oxenreider,* supra; *Commonwealth ex rel. Berman v. Berman,* supra. While we cannot nullify or usurp the *fact-finding* function of the trial court, we are not bound by the deductions or inferences made by them. *Robert H.H. v. May L.H.,* 293 Pa.Super. 431, 439 A.2d 187 (1981); *In re Davis,* 288 Pa.Super. 453, 432 A.2d 600 (1981); *Garrity v. Garrity,* 268 Pa.Super. 217, 407 A.2d 1323 (1979). Therefore, if the issue is whether we should reverse the lower court's findings of fact, we must defer to the lower court and reverse only where, in making the findings, the lower court has abused its discretion. *Commonwealth ex rel. Berman v. Berman,* supra; *In re Custody of Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977). However, because of our requirement to exercise independent judgment, we will not adhere to an abuse of discretion standard in reviewing the determination of the lower court. See *Robert H.H. v. May L.H.,* supra; *Commonwealth ex rel. Berman v. Berman,* supra; *In re Arnold,* id. 286 Pa.Super. [171] id. at 176, 428 A.2d [627] at 629 [ (1981) ] (HOFFMAN, J., concurring); *Common-*

*wealth ex rel. E.H.T. v. R.E.T.*, 285 Pa.Super. 444, 457, 427 A.2d 1370, 1376 (1981) (HOFFMAN, J., concurring). *Commonwealth ex rel. Newcomer v. King*, 301 Pa.Super. 239, 244–245, 447 A.2d 630, 633 (1981).

This broad scope of review has its origins in the Habeas Corpus Act of July 11, 1917, P.L. 817 § 1, and the Orphans Court Act of June 7, 1917, P.L. 363 § 22(b). The Habeas Corpus Act provided that in reviewing a custody award, the Superior Court "shall consider the testimony and make such order upon the merits of the case . . . as to right and justice shall belong." The Orphans Court Act similarly provided that the Supreme and Superior Courts "shall, in all cases of appeal from the definitive sentence or decree of the orphans' court, hear, try, and determine the same as to right and justice may belong, and decree according to the equity thereof . . . ." Although these statutory provisions were amended, and in fact eventually repealed, the scope of review has always remained the same.[1] *See, e.g., Common-*

1. The Habeas Corpus Act of 1917 was repealed by the Act of June 3, 1971, P.L. 128 § 509(a)(66)), 17 P.S. § 211.509(a)(66), retroactive to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, 17 P.S. §§ 211.101 *et seq.* The effect was to make habeas corpus appeals in custody cases like any other habeas corpus appeal. *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 443 n. 4, 292 A.2d 380, 383 n. 4 (1972). The scope of review, however, remained the same: "Notwithstanding recent changes in the habeas corpus statutes pertaining to appeals in child custody proceedings, the scope of review of this Court and of the Superior Court remains that of the broadest type." *Id.*, 448 Pa. at 443, 292 A.2d at 383 (footnote omitted).

The Orphans Court Act of 1917 was repealed by the Orphans Court Act of 1951, Act of August 10, 1951, P.L. 1163, 20 P.S. §§ 2080.101 *et seq.*, but the Act of 1951 contained a similar provision, 20 P.S. § 2080.773, and while this provision was repealed by the Probate Estates and Fiduciaries Code of 1972, Act of June 30, 1972, P.L. 508, the Probate Code also contained a similar provision, 20 P.S. § 794:

The Supreme Court of the Commonwealth shall, in all cases of appeal from a decree of the orphans' court division, hear, try and determine the same as to right and justice may belong, and decree according to the equity thereof, and may place or allocate the record costs, including printing costs, upon an appellant or appellee or upon the estate or trust.

(At the time the Supreme Court had exclusive jurisdiction of appeals from the orphans' court, 17 P.S. § 211.202(3)). This provision was repealed by the Judiciary Act Repealer Act of April 28, 1978, P.L. 202,

*wealth ex rel. Davenport v. Montgomery County Children and Youth Services,* 501 Pa. 472, 476, 462 A.2d 221, 223 (1983) ("[W]e have held that the scope of review in custody matters is of the broadest type ..."); *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 262, 455 A.2d 1180, 1183 (1983) ("[A]ppellate courts possess a broad scope of review in custody cases."); *Commonwealth ex rel. Pierce v. Pierce, supra* 493 Pa. at 295–97, 426 A.2d at 557 ("Our scope of review in a custody matter is of the broadest type ..."); *Albright v. Commonwealth ex rel. Fetters, supra* 491 Pa. at 324, 421 A.2d at 158 (1980) ("We have traditionally embraced the view that the scope of review to be applied by appellate courts in custody cases is very broad."); *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 294–296, 368 A.2d 635, 637 (1977) ("[O]ur law has long recognized that the scope of review of an appellate court reviewing a custody matter is of the broadest type.").

In *Ciammaichella Appeal,* 369 Pa. 278, 85 A.2d 406 (1952), the Supreme Court expressly rejected the argument, which this court had embraced, that the scope of review should be limited to inquiring whether the trial court has abused its discretion. *Ciammaichella* involved a custody dispute between a mother and foster parents. The trial court awarded custody to the mother. This court affirmed. The Supreme Court allowed an appeal "because ... the Superior Court misconceived its reviewing function." *Id.,* 369 Pa. at 280, 85 A.2d at 407. The Court stated that the appellate "scope of review extends to the fullest review

but the repealed provision has been replaced by 42 Pa.C.S.A. § 706, which provides:

An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances.

While this provision makes no mention of the scope of review, it is apparent that the Supreme Court has continued to apply the broad scope of review in custody cases. Thus the various cases decided under the repealed statutes remain valid and in fact are still cited by the Court, *see, e.g., Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980).

consistent with equitable principles," *id.*, 369 Pa. at 281, 85 A.2d at 408, and that "[d]espite the broad power thus conferred upon the Superior Court, it held that the scope of its review was limited to ascertaining only whether the lower court had abused its discretion in making its award of custody.... Where so important an issue as the welfare of a child is involved, in which the State has a paramount interest, the Superior Court should not in this case have limited its review but have exercised its independent judgment after consideration of the entire record." *Id.*, 369 Pa. at 280–282, 85 A.2d at 408. Exercising *its* independent judgment, the Supreme Court concluded: "After examination of the entire record in this case, a careful review of all the testimony and full consideration of the able briefs and argument by counsel, we have independently arrived at the same conclusion reached by the lower court, that the welfare of this child is best served in the home of her mother and sister.... Under all the facts and circumstances of this case, with full consideration given to the effect of the necessitated change of environment from the home of the foster parents to that of the mother, we would have arrived at the same conclusion reached by the lower court had we in the first instance been charged with the duty imposed upon it." *Id.*, 369 Pa. at 287, 291, 85 A.2d at 411, 412. *See also, Commonwealth ex rel. Bendrick v. White*, 403 Pa. 55, 169 A.2d 69 (1961) ("It is our duty not simply to determine from the record whether the trial court has abused its discretion but to examine *all* the evidence and reach an independent determination ...") (emphasis in original) (citation omitted). Having thus been specifically, even, one may say, pointedly, corrected by the Supreme Court, we should not again attempt to embrace the abuse of discretion standard.

–(b)–

Those who suggest an abuse of discretion standard often emphasize the fact that the trial court has seen and heard the witnesses. For example, Judge WIEAND speaks of "the trial judge's observations of the witnesses, of glances exchanged between the children and their parents, of a

grimace, a nod of the head, or a blinking of the eye." WIEAND, J., at 83. But an appellate court exercising a broad scope of review may be equally aware of, and quite as sensitive to, these considerations. As the Supreme Court has repeatedly emphasized, the appellate court is not "free to nullify the fact-finding function of the hearing judge" but, rather, is bound by, and must accept as its point of departure, the facts as found by the trial judge.

A rather dramatic illustration of this principle is the Supreme Court's decision in *Commonwealth ex rel. Harry v. Eastridge*, 374 Pa. 172, 97 A.2d 350 (1953). There the trial court had awarded the custody of two children to their mother, despite testimony that the mother was unfit to have custody. The mother denied that she was unfit and the trial court believed her. This court, however, reversed the trial court's award. On appeal, the Supreme Court reversed this court. "Decision of the present case," the Supreme Court said, "depended largely upon a determination of the credibility of the witnesses." *Id.*, 374 Pa. at 175, 97 A.2d at 352. Noting that this court had accepted as credible the testimony indicating that the mother was unfit, and had based its decision on that testimony, the Supreme Court said: "But in so doing [the Superior] Court rejected the unqualified denial by [the mother] which was believed by the judges who saw her in the courts below . . . ." *Id.*, 374 Pa. at 175, 97 A.2d at 352. (emphasis in original). The Court continued: "The Superior Court's decision was thus based on a categorical rejection of the conclusions on credibility reached by the two hearing judges who observed the witnesses and listened to their testimony." *Id.*, 374 Pa. at 176, 97 A.2d at 352. In reversing this court, the Supreme Court went to some pains to dispel the mistaken belief, which also underlies Judge WIEAND's opinion, that the duty to exercise a broad scope of review permits the appellate court to act as fact-finder. To the contrary, said the Court, the broad scope of review "was never intended to mean that an appellate court is free to nullify the fact-finding function of the hearing judge. It is a principle which

runs through all our cases that the credibility of the witnesses and the weight to be given to their testimony by reason of their character, intelligence, and knowledge of the subject can best be determined by the judge before whom they appear." *Id.*, 374 Pa. at 177, 97 A.2d at 353. The Supreme Court concluded that this court had "failed to give such weight to the opinions of the two judges who heard the witnesses in the present case", *id.*, 374 Pa. at 178, 97 A.2d at 353, and therefore reversed our order.

Thus admonished, we have repeatedly acknowledged our duty to defer to the trial court's appraisal of the witnesses' credibility. Nor, it should be emphasized, has this acknowledgment been at all grudging; we know that by far the best way to appraise credibility is to see the witnesses. Thus we have said that in applying our broad scope of review, we apply it to the facts as the trial court has found them. *In re Desiree B.*, 304 Pa.Super. 461, 450 A.2d 1003 (1982) (appellate court will not nullify fact-finding of trial court); *Commonwealth ex rel. Strunk v. Cummins*, 258 Pa.Super. 326, 392 A.2d 817 (1978) (same); *In re Leskovich*, 253 Pa.Super. 349, 385 A.2d 373 (1978) (same); *Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 374 A.2d 1386 (1977) (same). *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977) (same).

Those who suggest an abuse of discretion standard seem not to appreciate this interplay between, on the one hand, accepting the trial court's determinations of credibility, and on the other hand, exercising a broad scope of review. They seem to regard a broad scope of review as "usurp[ing] the function of the trial court." WIEAND, J., at 83. But there is neither inconsistency nor usurpation in accepting the facts as the trial court has found them, and then applying to those facts a broad scope of review. For example, in *Snellgrose Adoption Case*, 432 Pa. 158, 247 A.2d 596 (1968), the Supreme Court accepted the trial court's findings of fact, but, exercising its independent judgment, reversed the trial court's award. The trial court did not regard the evidence of the mother's relationship

with a married man and her conduct while in the presence of her daughter as sufficient reason for not awarding custody of the daughter to the mother. The Supreme Court disagreed, stating that the mother's conduct was "such as to deprive a home where a young girl is being raised a healthy moral atmosphere." *Id.*, 432 Pa. at 164, 247 A.2d at 599. While accepting the trial court's findings, the Court, exercising its broad scope of review, drew its own inferences and deductions, and concluded: "From an independent examination of the record, then, we must disagree with the lower court's conclusion that there are no compelling reasons which warrant depriving [the mother] of custody of her child." *Id.*, 432 Pa. at 168, 247 A.2d at 601. Similarly, the Supreme Court has on occasion exercised its broad scope of review to reverse this court. In *Hooks v. Ellerbe*, 257 Pa.Super. 219, 390 A.2d 791 (1978), this court reversed the trial court's award of custody. That case involved a custody dispute between the father and maternal grandmother of an eleven year-old child. We held that in awarding custody to the grandmother the trial court had applied an improper legal standard, failing to give the parent-child relationship sufficient consideration. Exercising its independent judgment, the Supreme Court reversed our decision and awarded custody to the grandmother. *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980). The Court explained that even though it agreed with us that the trial court had applied an improper legal standard, still, "our [*i.e.*, the Supreme Court's] review of the record convinces us that the trial court's determination may still stand." *Id.*, 490 Pa. at 371, 416 A.2d at 515.

–(c)–

A broad scope of review is essential if the appellate court is to fulfil its responsibility to children. To state the point conversely: an appellate court deciding that it will reverse a custody award only for abuse of discretion abdicates its responsibility. After all, an "abuse of discretion" is a very serious matter, coming close to judicial misconduct. "It is not a mere error of judgment.... [A] court's judicial

discretion in a given situation is governed by the legal principles that are applicable to that situation; and if in reaching a conclusion the law is departed from, overridden or misapplied, or the judgment exercised by the lower court is manifestly unreasonable, or is the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused, and it is the duty of the appellate court to correct the error." 16 Stand.Pa.Prac.2d 464–465 (footnotes omitted). This is the least exacting standard of appellate review, reserved for cases of the most routine sort. *Universal Builders Supply Inc., v. Shaler Highlands Corp.*, 409 Pa. 334, 186 A.2d 30 (1962); (order granting or refusing petition to open judgment will be reversed only for abuse of discretion); *Commonwealth ex rel. Alexander v. Alexander*, 445 Pa. 406, 289 A.2d 83 (1971), (support). A person accused of crime receives far greater appellate protection, for in criminal cases we reverse unless satisfied beyond a reasonable doubt that error was harmless. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). To be sure, considering the threat that prosecution for crime poses to reputation and liberty, we owe the accused this consideration. But surely we owe our children no less.

In this regard, it is important to recognize that those who suggest an abuse of discretion standard would go even further than putting child custody cases at the bottom of the appellate pile. As pointed out in *McQuiddy v. McQuiddy*, 238 Pa.Super. 390, 393, 358 A.2d 102, 104 (1976);

[W]hen the court has come to a conclusion by the exercise of its discretion, the party complaining of it on appeal has a heavy burden; it is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power.

Thus, to adopt an abuse of discretion standard would precisely reverse our obligation to children: instead of "mak[ing] such an order on the merits of the case as *right*

*and justice dictate," Commonwealth ex rel. Pierce v. Pierce, supra,* (emphasis added), we should have to affirm an order that we believed *wrong.*

–(d)–

Finally, those who suggest an abuse of discretion standard seem not to appreciate the complexity of the appellate process that has been developed under the rubric, "broad scope of review." They seem to imagine only two, very different, alternatives: either we must reverse only for abuse of discretion, or we will find ourselves on some sort of uncharted sea, where we must make an unguided independent judgment. The reality is quite different.

Perhaps the most useful way to think of the appellate process in a child custody case is as proceeding in four stages. The first stage may be described as the procedural stage; the second, as the fact-finding stage; the third, as the conclusion of law stage; and the fourth, as the inferences and deductions stage.

At the first, procedural, stage of the appellate process, the appellate court examines the record to determine whether the trial court has satisfied the several procedural requirements incident to the entry of a custody award. To enable the appellate court to exercise its independent judgment, the trial court must make a complete record. *Garrity v. Garrity,* 268 Pa.Super. 217, 407 A.2d 1323 (1979); *Augustine v. Augustine,* 228 Pa.Super. 312, 324 A.2d 477 (1974). This means that the record must contain testimony adequate to illuminate the circumstances of the parties. *Sipe v. Shaffer,* 263 Pa.Super. 27, 396 A.2d 1359 (1979); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). There should be testimony by interested and disinterested witnesses alike. *J.F.G. v. K.A.G.,* 278 Pa.Super. 25, 419 A.2d 1337 (1980); *Lewis v. Lewis,* 267 Pa.Super. 235, 406 A.2d 781 (1979). The testimony must describe the parties' respective homes, and sometimes expert testimony is necessary. *Rupp v. Rupp,* 268 Pa.Super. 467, 408 A.2d 883

(1979) (remand for psychiatric testimony and disinterested testimony on homes).

If, at the procedural stage, the appellate court determines that the record is incomplete, ordinarily the case will be remanded to the trial court for further hearing. This very case illustrates such a remand. When it was first appealed to this court, we remanded because "the record [was] totally devoid of any evidence regarding the nature and quality of the children's foster placements, the degree of attachments which the children have formed in foster care, and the effect which return of the children would have on them." *In Re Donna W.*, 284 Pa.Super. 338, 349, 425 A.2d 1132, 1137 (1981).

The appellate court also considers at the procedural stage whether the trial court has filed a complete and comprehensive opinion, including findings of fact and reasons for the award. *Strapple v. Strapple*, 263 Pa.Super. 187, 397 A.2d 809 (1979); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). If the record is otherwise complete, it may not be necessary to remand for a comprehensive opinion, *Commonwealth ex rel. Husack v. Husack*, 273 Pa.Super. 192, 417 A.2d 233 (1979), *Tomlinson v. Tomlinson, supra*, but often remand is necessary to enable us to exercise our independent judgment, *Strapple v. Strapple, supra; Commonwealth ex rel. Forrester v. Forrester*, 258 Pa.Super. 397, 392 A.2d 852 (1978).

Once satisfied that the trial court has made no procedural errors requiring remand, the appellate court proceeds to the second, fact-finding, stage of the appellate process. At this stage the appellate court examines the trial court's findings of fact. As has already been discussed, the appellate court is bound to accept the trial court's findings, *see e.g., Commonwealth ex rel. Harry v. Eastridge, supra*, but this of course assumes that the findings are supported by evidence of record. Generally, they are. But if examination discloses that findings determinative of the award are unsup-

ported by the record, it may be necessary to reverse.[2] *Jon M.W. v. Brenda K.*, 279 Pa.Super. 50, 420 A.2d 738 (1980).

If no procedural errors requiring remand have occurred, and the trial court's findings of fact are supported by the record, the appellate court proceeds to the third stage of the appellate process. At this stage the appellate court determines whether the trial court has committed an error of law. For as is true in all appeals, not only in child custody cases, the appellate court is never bound by the trial court's conclusions of law. Thus, the trial court's award will be reversed where based on the tender years presumption, *Haraschak v. Haraschak*, 268 Pa.Super. 173, 407 A.2d 886 (1979), or on the application of an improper burden of proof, *Ellerbe v. Hooks, supra; In Re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977). Where the trial court commits an error of law, the appellate court will usually remand to allow the trial court to rectify its error, *Schall v. Schall*, 251 Pa.Super. 262, 380 A.2d 478 (1977), but in some cases, depending on the evidence, the appellate court may make an award without remand, *In Re Custody of Hernandez, supra.*

It is only if no errors requiring remand are disclosed at any of the first three stages of the appellate process that the appellate court proceeds to the fourth stage. It is at this fourth stage that the appellate court must consider what inferences and deductions to draw from the facts as found by the trial court. In doing this we are not bound by the inferences and deductions of the trial court, as we are bound by its findings of fact. Rather, as the Supreme Court and this court have said:

**2.** Sometimes it is said, inaccurately and misleadingly, that the trial court's findings will be "reverse[d] where in making the findings the [trial] court has abused its discretion." *Commonwealth ex rel. Berman v. Berman*, 289 Pa.Super. 91, 93, 432 A.2d 1066, 1067 (1981). The accurate statement is that the findings may not be nullified unless unsupported by the record. This principle, it may be added, includes findings regarding "the parties' emotional feelings and attitudes towards one another." *Commonwealth ex rel. Zaffarano v. Genaro, supra* 500 Pa. at 256, 455 A.2d at 1180. *See* also, *Commonwealth ex rel. Davenport v. Montgomery County Children and Youth Services, supra.*

Our scope of review in a custody matter is of the broadest type, and we are not bound by deductions or inferences made by a trial court. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 295, 368 A.2d 635, 637 (1977). We must exercise an independent judgment based on the evidence and make such an order on the merits of the case as right and justice dictate. *Adoption of Farabelli*, 460 Pa. 423, 433, 333 A.2d 846, 851 (1975); *Snellgrose Adoption Case*, 432 Pa. 158, 163, 247 A.2d 596, 599 (1968).

*Commonwealth ex rel. Pierce v. Pierce, supra*, 493 Pa. at 295–297, 426 A.2d at 557.

*And see: Commonwealth ex rel. Newcomer v. King, supra; Robert H.H. v. May L.H.*, 293 Pa.Super. 431, 439 A.2d 187 (1981).

This process of an appellate court drawing its own inferences and deductions is illustrated in *Snellgrose Adoption Case*, discussed *supra* at p. 48–49. *See*, concurring opinion by Chief Justice BELL 432 Pa. at 168–169, 247 A.2d at 601, explaining reason for the Court's reversal: "An appellate Court is not bound to accept so-called findings of fact which are in reality deductions, inferences and conclusions found by the lower court...." (citations omitted). It is also illustrated in *In Re Custody of Temos*, 304 Pa.Super. 82, 450 A.2d 111 (1982), where this court, exercising its independent judgment, drew its own inferences and deductions and reversed the order of the trial court. The case involved a custody dispute between the parents of two minor children. The trial court, in awarding custody to the father, relied on three factors:

that the mother "maintained a close relationship with a married man;" that the mother was involved in two questionable financial transactions; and that since the parties' divorce, "the mother has become increasingly career-oriented [and] has placed heavy reliance on baby-sitters."

*Id.*, 304 Pa.Superior Ct. at 85, 450 A.2d at 112.

This court examined each factor and concluded that none of them supported an award of custody to the father. We therefore reversed, awarded custody to the mother, and remanded the case so that the trial court could provide for the father's visitation.

–2–

–(a)–

When this case was last before us, our review proceeded only so far as the first stage of the appellate process required by the application of a broad scope of review. Examining the record to determine whether the trial court had made any procedural error, we discovered that indeed it had: the record was devoid of any evidence regarding the quality of the children's foster care, the degree of the children's attachment to the foster parents, or the probable effect on the children of returning them to their mother. We therefore reversed and remanded with instructions to make a complete record. *In re Donna W., supra.* On remand the trial court did make a complete record. It is therefore now in order to proceed to the second stage of the appellate process, and determine whether the trial court's findings of fact are supported by the record.

This determination is complicated by the fact that the trial court has made no findings of fact as such, instead simply delivering its decision in narrative form. As a result, the basis of the trial court's award is somewhat obscure, as will be more fully discussed in a moment. However, it is plain enough that the findings of fact implied in the trial court's narrative are supported by the record. Therefore, accepting the findings as binding, we may proceed to the third stage of the appellate process, and determine whether the trial court correctly applied to the facts as it found them the pertinent principles of law.

In making this determination, we may start with Judge HESTER's statement of the case, HESTER, J., at 68–74, for it admirably summarizes the conflicting positions taken by the respective parties, thereby making plain the

poignance of the situation we must do our best to resolve. (Judge WIEAND's statement of the case is also very fine, but we refer particularly to Judge HESTER's because of its description of the expert testimony.) Without repeating or paraphrasing Judge HESTER's statement, it seems fair to identify three aspects of that situation as dominant.

First: The children, Donna, now seven, and Edward, now six, have, in the opinion of all three of the expert witnesses, developed strong "psychological bonds" to their foster parents. This has occurred because of the fact, recited by the trial court, that "[t]he children have been out of the custody of the mother from May 23, 1978, and before that, Donna had been placed by the mother with Children and Youth Services in April, 1977 because of her instability and threats of abuse from the children's father, who is presently in prison." Slip op. of the trial court, at 3.

Second: During this period the mother has continued to visit her children consistently. She has also improved her circumstances. "Undeniably, appellant [the mother] can now provide the physical accommodations to meet the material needs of her children." HESTER, J., at 72. "There is no contention on the part of Children and Youth Services or the Child Advocate that the mother's living conditions at this time are inadequate, and testimony received from the Children and Youth Services investigators from Washington County indicated that she is in a clean, suitable physical environment . . . ." Slip op. of trial court, at 15.

Third: The three experts were in sharp disagreement regarding how best to resolve, or accommodate to, the tension thus created between the children's desire to be with their foster parents and the mother's desire to have them with her. One expert, a clinical child psychologist retained by Children and Youth Services, was of the opinion that Donna was an emotionally insecure child, that the relationship between her and her mother was insecure, and that her foster mother could provide the care she needed better than her mother could, and that Edward had so close an attachment to his foster father and manifested so much

resistance to his mother that for him to leave his foster parents for his mother would be harmful to his long-term adjustment. The two other experts, one a child developmental specialist retained by the mother, the other a child psychologist whose independent evaluation was requested by the trial court, were of the opinion that the "bonding" was not nearly so firm, and that the best interests of the children required their immediate return to their mother. It is plain from the experts' testimony that this difference in opinion represented a clash between two different philosophies or schools of thought regarding child development— and indeed, the witnesses themselves so characterized their difference—the one school of thought emphasizing the importance to the child of a stable environment, the other the importance of being with the biological parents and biological siblings.

It is at this point that the above-mentioned obscurity in the trial court's opinion, arising from the court's failure to make findings of fact, becomes important. For its opinion may be read as resolving the problem presented by the conflicting expert testimony by holding as a matter of law that where the evidence discloses strong "psychological bonding" to the foster parents, an award to the natural parent is contrary to the children's best interests. This was in substance the position of the trial court when it first heard the case. Then, as we remarked in reversing and remanding, the trial court, despite the fact that the record was devoid of any evidence regarding the children's foster care or the probable effect of their return to their mother, expressed its unwillingness to order the children's "removal . . . from a stable, healthy environment which they have known for two years." *In re Donna W., supra* 284 Pa.Super. at 349, 425 A.2d at 1137 (quoting the trial court). One interpretation of the trial court's opinion is that nothing happened on remand to change the trial court's position: the court remained convinced that where bonding has occurred, children should not be moved.

■ It may be granted that the trial court is not alone in its conviction regarding the dispositive importance of bonding in deciding what is in a child's best interests. In *Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981), we received an *amicus curiae* brief, filed by The Regional Council of Child Psychiatry, urging on us the same conviction. There, as here, bonding to the foster parents had occurred. Nevertheless, we specifically rejected the *amicus* argument. In affirming an award removing the child from the custody of pre-adoptive parents and awarding her to her mother and father, we pointed out that psychiatry and the law are not co-extensive. While psychiatric considerations may very well be important, they must not be made determinative, for in deciding upon a child's best interests the court must take many factors into account. Parents have rights too. And for the state to take a child from a parent is a serious matter indeed. *See, Ellerbe v. Hooks, supra; In re Custody of Hernandez, supra*. In *Yack*, to have made bonding decisive, as we were urged to do, would have rewarded pre-adoptive parents who by their delaying tactics in the courts had enabled bonding to occur. We repeated our rejection of bonding as determinative of a child's best interests in *In re Desiree B., supra*, holding there that since "the concept of a child's best interests is a legal concept, not to be defined in psychiatric terms, *the question of bonding should not be the only one or the deciding factor.*" *Id.* 304 Pa.Super. at 468–469, 450 A.2d at 1007 (emphasis in original).

One of the greatest mistakes we can make is to regard as simple what is complex. If psychiatrists and psychologists *knew* how to achieve a child's best interests, deciding child custody cases would be comparable to diagnosing and treating a known medical condition. But psychiatrists and psychologists *don't* know—as the record of their disagreement in this case amply demonstrates. They can help by enriching the court's understanding of the complexities of how children develop, and the court may sometimes gain assurance from their counsel. But never may a court escape its

responsibilities by accepting as law the dictates of one school of thought over those of another school.

■ Thus, this case may be regarded as like a case in which the trial court has resolved the dilemma presented by conflicting testimony by resorting to the tender years presumption, or by improperly allocating the burden of proof— in other words, as a case in which in exercising our scope of review we need not proceed past the third, conclusion of law, stage. As we would reverse for error of law where the trial court applied the tender years presumption, so we may reverse for error of law where the trial court has applied a "psychological bonding presumption."

–(b)–

Judge HESTER is of the view that the trial court's decision should not be read in the manner just discussed, that is, as based on a "psychological bonding presumption." While he acknowledges that the trial court "heavily weighed" the fact of bonding, HESTER, J. at 651, he believes that the court regarded bonding as only one of the grounds of its decision. He may well be right. If he is, it is in order to proceed to the fourth stage of the appellate process: the trial court having made no error of law, we must, in the exercise of our independent judgment, draw our own inferences and deductions, and make such order as right and justice dictate.

The trial court explained the basis for its award as follows:

> [I]t is the conclusion of the court that taking all the evidence presented through the various hearings and looking at the case carefully from the point of view of the best interest of the child, and taking into consideration fully the rights that the natural parents have to the custody of their children, except in exceptional circumstances, the court believes that at this time that to return the children because of these developmental, interactional and attachment factors, would be contrary to their best interest.

Slip op. of trial court at 19.

The trial court determined that an award of custody to the mother was precluded by the following factors: 1) the factor that the mother could not deal with Donna's developmental problem; 2) the observation that during supervised visitations there was little interaction between the mother and her children, and 3) the strong bonding between the children and the foster parents. We have concluded that these factors do not support an order awarding exclusive custody to the foster parents.

■ The trial court's order makes no provision for support services for the mother, thus indicating that the court believes that the mother can never learn how to deal with Donna's problem. We disagree with this conclusion. The mother stated at the hearing that she was willing to work with the social agencies. N.T. 5/13/81, Vol. II at 158. The trial court, however, did not give her the chance to prove that she can learn to deal with Donna's problem, despite the acknowledged fact that the mother has already made considerable progress in achieving her own stability.

■ We also do not place much weight on the second factor—that during supervised visitations there was little interaction between the mother and her children. Each visit was supervised by a case worker and a foster parent. It is difficult to conceive of a more inhibitive environment. The mother testified that her visits with the children were much better before they were supervised. N.T. 5/13/81, Vol. II at 155.

■ Finally, as we have already discussed, we do not assign to the factor of bonding the heavy weight assigned by the trial court. *See* discussion at pp. 55–57, *supra.* The mother has not had the opportunity to form bonds with her children, for she has been limited to one hour visits twice a month. N.T. 5/13/81, Vol. I at 108. We realize that the children have been in foster care for about five years now, and that stability is important to their welfare.

But as we said in *In Re Custody of Hernandez, supra* 249 Pa.Super. at 296–298, 376 A.2d at 660:

There can be no question that stability is important to a child's welfare, and that in deciding who should have custody of the child it will therefore always be essential to consider how long the child has spent with the third party. *Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa.Super. 556, 307 A.2d 411 (1973); *Commonwealth ex rel. Kraus v. Kraus,* supra [185 Pa.Super. 167, 138 A.2d 225 (1958)]. This consideration, however, must take into account all of the evidence, including the reasons why the child has been so long with the third party. It has repeatedly been held that the fact that a child has been away from a parent for a long time will not by itself defeat the parent's right to custody. *In re: Adoption of Farabelli,* 460 Pa. 423, 333 A.2d 846 (child had lived with grandparents from birth until age of eight); *Commonwealth ex rel. Johnson v. Pinder,* 217 Pa.Super. 180, 269 A.2d 511 (1970) (during child's nineteen months of life father in Illinois working and attending college and able to visit child only three times); *Commonwealth ex rel. Lovell v. Shaw,* 202 Pa.Super. 339, 195 A.2d 878 (1963) (five year old child with grandfather and step-grandmother since age of ten months).

In large part the courts—including this court—are to blame for the delay in this case; the mother has been trying to regain custody of her children for four years, and we cannot in good conscience forever deny her custody because of this delay. Yet that is the effect of the trial court's order granting exclusive custody to the foster parents. The very essence of the order is that the award of custody is permanent. The trial court makes no provision for visitation; it contemplates no eventual return of the children to the mother. To the contrary, in the trial court's view the position of the children must be stabilized, *once and for all;* having been formed, the "psychological bond[s]" are not to be broken.

While we differ with our colleague Judge HESTER's opinion so far as it concerns the scope of our review, we admire the following passage from his opinion, for it captures the heart of this case:

Appellant [the mother] admittedly is not a stranger to Donna and Edward. Through her parental interest, she has remained a constant in their young lives and can nurture and encourage the growth of the delicate bonds of attachment which exist between each child and herself. Appellant should continue to receive support and training in the development of her parenting skills. When, through continued contact with [her] children and the enhancement of her custodial fitness, the best interests of the children warrant their return to appellant, *then she should be awarded custody.*

HESTER, J., at 74 (emphasis added).

■ It is unquestioned that the mother has overcome problems most of us never encounter; that, in the trial court's words, "there has been an improvement in the mother's ability to maintain a stable living environment ....," slip op. of trial court at 5; that the mother's relationship with Damon, the mother's youngest child, is "very happy," N.T. 4/1/81 at 90; that Damon is healthy and the mother's home in good condition, N.T. 4/1/81 at 79, 80; and that the mother wants her children back "very badly," N.T. 5/13/81, Vol. II at 156, and is willing to allow them to keep in touch with their foster parents, N.T. 5/13/81, Vol. II at 157. Exercising our independent judgment, as we must do, and drawing our own inferences and deductions from the facts as the trial court has found them, and as the record shows them to be, we have concluded that while on the one hand, the importance of stability in the children's lives justifies an order providing that the children remain in the homes of their foster parents, on the other hand, the mother should be given the chance Judge HESTER would give her. We shall therefore affirm the award of custody to Allegheny County Children & Youth Services but remand the case with instructions to the trial court to provide, after such

further hearing as the court finds appropriate, for visitation between the mother and her children and further to provide the mother with support and training in the development of her skills as a parent. In recognition of the delay that has occurred in this case, a good deal of it our responsibility, the trial court should provide for such visitation, support and training at its earliest opportunity.

So ordered.

HESTER and BECK, JJ., filed concurring and dissenting opinions.

WIEAND, J. filed a dissenting opinion.

HESTER, Judge, concurring and dissenting:

In this case, we are called upon to settle, once and for all, the question of the appropriate standard of review to be applied in custody matters. Several members of this Court advocate the adoption of a broad scope of review which inherently involves the exercise of our own independent judgment. I believe that the proper standard of review is one which defers to the lower court except in those instances where the hearing judge abused his discretion.

The Pennsylvania Supreme Court has cited this standard of review which has been previously articulated by our Court:

"... [W]e have recognized that the trial judge is in a position to evaluate the attitudes, sincerity, credibility, and demeanor of the witness. Because we are not in such a position, we have recognized that a trial judge's determination of custody should be accorded great weight. Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge." *Commonwealth ex rel. Rainford v. Cirillo,* 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972).

*Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 295–6, 368 A.2d 635, 637 (1977) (Plurality Opinion by Nix, J., with three Justices concurring). *See also In re Custody of*

*J.S.S.,* 298 Pa.Super. 428, 444 A.2d 1251 (1982); *Commonwealth ex rel. E.H.T. v. R.E.T.,* 285 Pa.Super. 444, 427 A.2d 1370 (1981); *In re Custody of White,* 270 Pa.Super. 165, 411 A.2d 231 (1979). We are not here to engage in *de novo* review of custody cases. See *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980); *In re Custody of Neal,* 260 Pa.Super. 151, 393 A.2d 1057 (1978); *Tobias v. Tobias,* 248 Pa.Super. 168, 374 A.2d 1372 (1977). Although we are never bound by findings of fact which lack sufficient support in the record, this Court has often stated in past opinions that we are also not bound by inferences or deductions adduced by the lower court from the facts. However, when those factual findings are based upon competent evidence, I submit that those inferences and deductions which flow therefrom must be upheld, absent an abuse of judicial discretion.

This standard appears to be that employed by the Supreme Court recently in *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 455 A.2d 1180 (1983). Therein, the hearing judge refused to grant temporary custody of a minor to the natural grandparents after the death of her own mother in a automobile accident. The hearing judge found as a fact that "there [was] some underlying bitterness between the Zaffaranos and Richard resultant from Carmella's untimely death." He therefore concluded that " '[t]he present hard feelings which unhappily exist may well serve to place Shannon [the child] in a cross-fire between conflicting adults which would certainly not be in her best interest.' " *Id.,* 500 Pa. at 259, 455 A.2d at 1181–1182. Visitation and temporary custody rights were denied.

A panel of this Court (SPAETH, BROSKY and HOFFMAN, JJ.) reversed. See *Commonwealth ex rel. Zaffarano v. Genaro,* 286 Pa.Super. 436, 429 A.2d 17 (1981). In doing so, the panel rejected the lower court's finding of fact with respect to the feelings and attitudes displayed by the parties in their relationships with each other, and substituted its own finding that "there does not exist between these

parties an 'irreconcilable animosity' . . . ." Rather, it analogized the situation to a "temporary falling out rather than a permanent estrangement." *Id.*, 286 Pa.Superior Ct. at 442, 429 A.2d at 20. This Court went on to reject the deduction of the lower court that the requested relief would be inappropriate, and again substituted its own conclusion that partial custody with her grandparents was in the minor's best interests.

The Pennsylvania Supreme Court reversed, holding that the Superior Court erred in substituting its factual finding for that of the trial court, and in rejecting the conclusion of the hearing judge which was based upon competent evidence. Thus, the Supreme Court upheld the deductions and inferences of the trial court, which were founded upon sufficient evidence and which were free from any abuse of discretion, and rejected the independent judgment of the Superior Court.

In another recent case, *Commonwealth ex rel. Davenport v. Montgomery County Children & Youth Services,* 501 Pa. 472, 462 A.2d 221 (1983), the hearing judge concluded that the best interests of a four-year old child would be served by placing her in the custody of her maternal grandparents. The mother of the child had executed a voluntary placement agreement giving custody to Children and Youth Services of Montgomery County after the child had been abused by the mother's boyfriend. That agency then placed her with the maternal grandparents. The natural father, who sought custody, was granted visitation rights. The lower court based its decision on the fact that the father's interest in his daughter, as evinced by her attendance at a day care center for 10 hours a day while he remained unemployed and his few visits with her during a lengthy separation, was minimal.

A panel of this Court rejected the lower court's deductions about the father's fitness as custodian and awarded custody of the child to him. Our Court held that the father's right to custody was paramount, that he had not

forfeited that right, and further, that the best interests of the child mandated that she be placed with her father.

The Supreme Court reversed, stating:

The hearing court's determination that the maternal grandparents will provide a stable and loving home which will serve Kathy Ann's best interests is amply supported by the record and should not be disturbed.

*Id.*, 501 Pa. at 476–77, 462 A.2d at 224. Further, it observed that the "Superior Court's rejection of the lower court's factual determination and substitution of its own conclusion constituted impermissible appellate fact-finding on this record." *Id.* The Supreme Court, once it determined the findings of fact of the hearing court were supported by competent evidence, upheld the decision of that tribunal which was based upon those facts.

Regardless of the copious rhetoric which has defined our scope of review as an abuse of discretion standard or a broad scope of review, I simply submit that the task the Supreme Court performed in the above cases is what we should also do: examine the record to determine if the foundation for the lower court's decision—that is, the facts upon which it relies—is supported by the record. If so, and if the disposition logically flows therefrom, it should be upheld.

There are numerous sound reasons for such a course of conduct. While these have been addressed in Judge WIEAND's scholarly compendium *sub judice*, there are two grounds which I would like to stress. First, this deference to the lower court's decision acknowledges the unique vantage point occupied by the trial judge. As the Supreme Court eloquently observed:

the feelings and attitudes exhibited by the parties towards one another ... are sometimes discernable only by the hearing judge who has an opportunity to observe the witness. The mere fact that a witness says he harbors no ill will towards another individual does not establish that fact; particularly in cases such as this in which the emotions of the parties are relevant to a determination of

the child's best interest, the demeanor of the witness is crucial in judging his sincerity and truthfulness. *Commonwealth ex rel. Zaffarano v. Genaro,* supra, 500 Pa. at 262–63, 455 A.2d at 1183. In custody cases, where the course of a child's life hangs in the balance, the hearing judge and not the appellate bench is in a position to assess the veracity of the witnesses and to determine whether the witness' eyes reflect what mere words often do not.

Secondly, by adopting this standard, it instills in the lower court order a degree of finality which creates an aura of assurance that the decision will be an abiding one. The parties can begin to live their lives as decreed by the lower court, and not in anticipatory hope that an independent review by an appellate court will find in an opposite fashion than the hearing judge.

President Judge SPAETH characterizes the above scope of review as the least exacting and as an abdication of our responsibility (Opinion by SPAETH, P.J., at 49–50). I most wholeheartedly disagree. President Judge SPAETH fails, I submit, to appreciate that this standard comports with our function as a court of review and not one of original jurisdiction, and with the need to protect the helpless parties, the children, from endless protracted proceedings. If our Court were to exercise President Judge SPAETH's standard of independent judgment, the parties would be forced to put their lives on hold while we second-guess the decision of the hearing judge. For the foregoing reasons, I must disagree with President Judge SPAETH in his belief as to the appropriate standard of review for our court in child custody matters.

However, for the following reasons, my review of this case, pursuant to the abuse of discretion standard, leads me to join President Judge SPAETH in his final disposition.

Once a child has been declared "dependent" pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6301(b)(3), and separated from his parent or parents, the court must thereafter make a determination of custody premised solely upon the best interests of the child. See *Stapleton v. Dauphin County*

*Child Care Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974); *In re Donna W.,* 284 Pa.Super. 338, 425 A.2d 1132 (1981). Although this standard can be succinctly expressed, the actual determination as to what constitutes the best interests of a particular child defies such facile articulation. Numerous factors must be considered, foremost of which is the natural parents' claim to custody. As we observed in *Stapleton,* supra 228 Pa.Super. at 391, 324 A.2d at 573, "[i]n a given case this claim may prove of decisive weight." Other facts which must be analyzed include:

> the nature and quality of the children's foster placements, the degree of attachments which the children have formed in foster care and the effect which return of the children would have on them. Such evidence should come from both interested and disinterested witnesses.

*In re Donna W.,* supra 284 Pa.Super. at 349, 425 A.2d at 1137. In addition, the court should recognize the acknowledged preference of this Commonwealth that siblings be reared together whenever possible. *Albright v. Commonwealth ex rel. Fetters,* supra.

So directed, the trial court examined the nature and quality of the placements, the degree of attachments, and the effect upon the children if they were removed from those environments. To assist the trial court in evaluating the degree of attachment of the children to the foster parents, psychological evaluations and observations were ordered of Edward and Donna. Three experts offered testimony concerning the degree of attachment between the children and their foster parents. While all three agreed that both children have developed psychological bonds to their foster families, with Edward strongly attached to his foster parents, opinions varied as to whether the children should be returned to the custody of their natural mother.

Dr. Neil Rosenblum, the clinical child psychologist retained by Children and Youth Services of Allegheny County (hereinafter CYS), testified that the best interests of the children required that they remain with their foster parents. The psychologist based his recommendation upon sessions

with the children, formal testing, observations of the children with appellant and with their foster parents, CYS records, and his own interactions with all of the parties involved.

In his evaluation of Donna, who was then 4½ years old, Dr. Rosenblum initially tested her alone and then observed her in the company of both her natural mother and her foster mother. As a result of his interview, he opined that Donna clearly had a stronger attachment to her foster mother than with her natural mother, that she required a strong, assertive type of approach in order to get her to work at a maximum level of effectiveness, that appellant was not very secure in her role or in her relationship with Donna, and that the foster mother was more successful in redirecting Donna's behavior. He concluded that Donna was an emotionally insecure child who was experiencing developmental delays and that the foster mother had the ability to provide the type of environmental and individual constructive attention which Donna needed.

Edward, 3 years old, was also evaluated in a setting which included both appellant and his foster parents. Dr. Rosenblum observed that Edward had formed an extremely close attachment to his foster father, exhibited unusual resistance to his natural mother, and displayed separation anxiety with respect to leaving his foster parents. Dr. Rosenblum concluded that such a move would be deleterious to Edward's long-term emotional adjustment. In his opinion, it was highly unlikely that Edward could form an acceptable attachment to his natural mother in light of his age.

In direct contrast to Dr. Rosenblum's testimony, Dr. Mark King and Dr. Robyn Woods, engaged by appellant, opined that the best interests of the children required an immediate return to their natural mother. These experts testified that she displayed love, affection, and nurturance towards her children. From the appropriate and positive

responses of the children, the doctors believed that psychological bonding did in fact exist between appellant and each of her children.

Dr. King and Dr. Woods attributed the children's present behavioral problems, which are manifested immediately after visits with their mother, to the unsettled and unresolved nature of the custodial situation. Dr. Woods is a psychologist whose particular area of expertise is bonding and attachment of children to non-biological parents. When questioned specifically about the children's behavior after visits with their mother, she said:

> I think the reactions you're seeing are indications of children who are needing a final decision made, and these children also, they're very young. If you were to ask them to somehow tell you, whether through behavior or otherwise, what their life situation is, they know their life situation is being decided in court, outside the jurisdiction of their mother or foster parents. They know there is tremendous instability. They know that they don't know what's going to happen, and what you see happening with them and their behavior is a reaction to the fact that they don't know what's going on.

Dr. Woods strongly urged that the children be returned to appellant, although she cautioned that continued contact with the foster parents was vital to the transition process.

At the hearing, Dr. King espoused a philosophical bias:

> I am starting off with a professional opinion, which the Court can accept or reject, and that is that the biological parents and the biological homes and the biological siblings over the long term of their development in life are the best for the children.

This belief served as the foundation for his evaluation and recommendations that Donna and Edward be returned to the custody of their natural mother. Dr. Woods also admitted that while she has a strong bias in favor of psychological parents,

I have a very strong bias in favor of biological parents, as well ... so, there is definitely an attachment to one's natural forces, whatever those are .... That is related to biology, and not psychology.

The trial judge rejected the theoretical approaches of both Dr. King and Dr. Woods.

As the arbiter of fact, the hearing judge may properly refuse to credit the experts' assumptions and the testimony which flows from them. Expert testimony in custody disputes, while often enlightening, must be viewed in its proper perspective. As (now President) Judge SPAETH, observed in *Commonwealth ex rel. Grimes v. Yack,* 289 Pa.Super. 495, 528, 433 A.2d 1363, 1381 (1981):

[t]he interests of a doctor caring for a patient are not always the same as the interests of the law.... Thus, the medical concept of illness is not the same as the legal and moral concept of culpability. The same may be said of a child's "best interests"; it is a legal concept and is not to be defined in psychiatric terms.

Consequently, the opinions of the psychologists cannot in and of themselves determine the ultimate issue. The conclusion of the experts must be evaluated as one part of the complicated legal process which seeks to define the best interests of the child.

It is true that the hearing judge heavily weighed the degree of attachments which the children have formed with their respective foster parents, as well as the apparent effect upon them if returned at this time to their natural mother. The testimony of Dr. Rosenblum that Donna's and Edward's regressive behavior was causally connected to the visits with their mother was deemed credible by the hearing judge, and served as one basis for his conclusion that the children should remain in their foster placements.

Unarguably, the natural parent's claim to custody "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements...."

*Ellerbe v. Hooks,* 490 Pa. 363, 369, 416 A.2d 512, 514 (1980), quoting *Kovacs v. Cooper,* 336 U.S. 77, 95, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949) (Frankfurter, J., concurring). However, in the search for the best interests of the child, it is only *one* of many factors to be carefully evaluated. As we stated in our initial review of this case, "the natural parents' claim to custody is a significant and *sometimes* decisive factor in custody disputes." *In re Donna W.,* supra 284 Pa.Super. at 343, 425 A.2d at 1134 (1981) (Emphasis added). In the case at bar, appellant's claim to custody simply did not carry the "decisive weight" that this claim does in many cases.

Appellant anticipated the return of her children in January, 1980. However, due to events immediately prior to that,[1] the trial court abandoned the plan to return the children to appellant. Thereafter, appellant continued to visit her children consistently. In August, 1980, during one of her visits with the children, appellant removed the children from the CYS office to her home and did not return them for five days. Subsequent to their return to their foster homes, both children suffered behavior problems which the trial judge concluded was a result of "poor judgment on [appellant's] part." This incident and appellant's failure to recognize the psychological damage to the children as a result of their abduction seriously undermined the trial judge's perception of appellant's custodial fitness.

Undeniably, appellant can now provide the physical accommodations to meet the material needs of her children. However, appellant's custodial fitness, when viewed by the lower court in the bright light of the best interests of the children, failed to reflect sufficient benefits to the children to outweigh the perceived harm which they would suffer in being removed from their foster homes. The hearing judge's decision not to relinquish custody of the children to their natural mother was thus supported by competent

---

1. Appellant was raped in early January, 1980, by a sixteen-year old acquaintance whom she met in a restaurant and invited home one evening.

evidence and did not constitute an abuse of discretion.[2] As such, I believe that the foster parents should retain physical custody of Donna and Edward with legal custody vested in CYS.

That is not to say that appellant should never prevail in her effort to obtain custody of Donna and Edward. Her parental rights have not been terminated; custody of her children has merely been removed to CYS until her fitness as a custodian has been re-established. This Court, and I am certain, the hearing court, is well aware of the characterization by the Juvenile Act of any transfer of legal custody of a dependent child as "temporary." 42 Pa.C.S.A. § 6351(a)(2).

At the hearing, Dr. Rosenblum commented on the feasibility of returning the children to appellant:

> I do feel that there is a possibility that the attachment between Donna and the natural mother would grow, but only if the natural mother was involved both individually and with Donna in some consistent professional counseling program, which would attempt to try to help her learn more effective parenting skills, which could help in the building of the small amount of attachment that I saw in the relationship between Donna and the natural mother. . . .

Similarly, steps could be taken to reduce the separation trauma that Edward would experience if returned to appellant. In addition to continued contact with the foster parents, Dr. Rosenblum recommended:

> If the mother were able to imitate or learn some of the types of ways in which the foster parents relate to Edward, that probably would help her and help reduce

---

**2.** While I note that the hearing judge failed to consider the recognized preference that siblings be reared together, a review of the record indicates that neither child mentioned the other when questioned on the members of their families. Moreover, Edward became annoyed in the presence of his mother's six-month old son who often accompanied her on visits to the children. Although the law recognizes the desirability of brothers and sisters living together, that fact alone is not of sufficient import to alter a custodial decision.

the discrepancy between the type of experience that he would have with, you know, the discrepancy of going from one type of home environment to another type. Appellant admittedly is not a stranger to Donna and Edward. Through her parental interest, she has remained a constant in their young lives and can nurture and encourage the growth of the delicate bonds of attachment which exist between each child and herself. Appellant should continue to receive support and training in the development of her parenting skills. When, through continued contact with her children and the enhancement of her custodial fitness, the best interests of the children warrant their return to appellant, then she should be awarded custody.

I therefore concur in the disposition of this case as drafted by President Judge SPAETH, which directs that the natural mother be offered every available assistance in her efforts to formulate appropriate parental skills. While these years cannot be recouped, it is our belief and hope that Donna and Edward have experienced the type of nurturing love and care from their foster parents which their natural mother will one day bestow upon them.

BECK, Judge, concurring and dissenting:

I join Judge Spaeth's opinion as to the scope of appellate review but disagree as to the disposition. I would reverse the disposition made by the trial court and return custody to the natural mother with the instruction that the foster parents be awarded visitation rights and that CYS establish a plan so as to continue to offer supportive service to the natural mother.

As other authors in the instant case have made clear, this appeal is being heard for the second time. On the first remand, *In Re Donna W.*, 284 Pa.Super. 338, 425 A.2d 1132, 1137 (1981) the lower court was directed to make an inquiry, inter alia, into the quality of the children's foster care. Judge Spaeth now characterizes this deficiency in the record as an example of procedural error; the error being that the record revealed that the trial court did not examine

"(t)he nature and quality of the children's foster placements ..." (Opinion of Spaeth, J., at 52).

This instruction, it seems to me, placed an unintended but erroneous focus on this matter. In child custody cases where the natural parent is a party and the other party is not a natural parent, the initial and primary inquiry should normally be the quality of the natural parent's care and not a comparative inquiry into the natural parent's care and the third party's care. If the natural parent's care is found to be adequate and appropriate for the needs of the child, then an inquiry into the quality of alternative care, in this case, foster care, becomes irrelevant as to the question of custody. The parties in the instant litigation are the state (Children and Youth Services of Allegheny County) and a natural parent. If testimony reveals that the natural mother can provide adequate and appropriate care for the child's needs, then a comparative study is irrelevant as to the question of custody. The posture of the instant case is far different from one in which the two competing parties are natural parents. In that situation the primary focus would be a comparative study.

In a custody dispute between a natural parent and third party the situation is not one in which both parties have an equal interest. In such a situation, the natural parent has a *prima facie* right to custody which may be forfeited only if there are convincing reasons that make it appear that the child's best interest will be served by an award of custody to a third party. *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980); *In re Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977). Before an inquiry is made as to the best interests of the child, there must be evidence adduced from which an inference can be drawn that the natural parent cannot provide adequate and appropriate care for the child's needs.

The trial court's decision that the children remain in the custody of their foster parents was premised upon their bonding to their respective foster parents and the trauma that will result from their separation from those foster

parents. While I have no doubt that the separation from those foster parents with whom the children had lived for three years at the time of the order appealed from will be unsettling, I do not find that trauma to constitute a convincing reason supporting the denial of appellant's application for custody of her children. As we noted in *Commonwealth ex rel. Staunton v. Austin*, 209 Pa.Super. 187, 193–94, 223 A.2d 892, 895–96 (1966) (citation omitted):

> We recognize, as [the psychiatrist] testified, that uprooting of Christina from the home of the [foster parents] at this time would undoubtedly be a shocking experience. To a certain extent, of course, this results from the protracted litigation for Christina's custody which has been in progress for over one and one half years. We believe, however, that Christina will be more than compensated for the shock resulting from this separation by the benefits she will receive from the opportunity to grow up in a family unit composed of her natural parents, brothers and sisters.

Likewise, I believe that whatever trauma will result from removal of appellant's children from their foster homes and return to appellant's care will be outweighed by the benefits they will receive from being raised and nurtured together in a home comprised of a mother who strongly desires their return as well as a step-brother. I emphasize that the longer custody to the natural parent is delayed, the more difficult the transition will be for the children.

The record reveals ample competent evidence supporting appellant's strong interest in the return of Donna and Edward. For example, appellant's neighbor, Donna Meyers, testified that appellant has expressed to her repeatedly that she desires the return of her children. Notes of Testimony ("N.T.") 4/1/81 at 93. Meyers additionally testified to the difficulties appellant, a resident of Washington County, faced in visiting her children in Pittsburgh. Appellant does not own a car, yet she made arrangements to either ride the bus or ride with Meyers the thirty-six miles each way in order to see her children. *Id.* at 102. Donna

Meyers had substantial contact with appellant inasmuch as they live in the same building.

Similarly, her Allegheny County CYS caseworker stated that appellant had visited her children conscientiously and acknowledged that the visits reflected her concern for her children and a sense of responsibility toward them. N.T. 5/13/81 (afternoon session) at 32. The Allegheny County CYS caseworker further stated that appellant has not wavered in her desire for their return. *Id.* at 33. Her strong interest in their return has not attenuated despite the difficulties in visiting them. *Id.* at 155–56.

In addition, denying the natural mother custody would serve to continue the separation of these two siblings who have been placed in different foster homes and undermine the "strong policy in our law that in the absence of compelling reasons to the contrary, siblings should be raised together whenever possible." *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 327, 421 A.2d 157, 160 (1980) (citations omitted). The lower court advanced no reasons why keeping the children in separate foster homes furthered their best interests, and this omission served to undermine this Court's explicit instruction to consider as a factor that "return of the children to appellant would serve the policy of keeping siblings together whenever possible[.]" *In Re Donna W.,* 284 Pa.Super. at 349 n. 5, 425 A.2d at 1137 n. 5 (citation omitted).

Evidence was also adduced at trial from appellant's Washington County caseworker that the natural mother had made adequate physical arrangements for her children's return. The lower court acknowledged the testimony of the caseworker as to the adequacy and suitability of the appellant's large two bedroom apartment. Her caseworker observed appellant with her third child Damon in the setting of her home.[1] He stated that "[h]e was alert and appeared healthy and was appropriately dressed." N.T. 4/1/81 at 80. In addition, the caseworker stated that

1. Damon was born in October, 1980. N.T. 5/13/83 (afternoon session) at 155. It was uncontroverted that appellant had provided a suitable home for him since that time.

"he contacted [appellant's Allegheny County CYS caseworker] and told her that there was no evidence or any indication of services that needed to be offered." *Id.* at 81. I conclude that her skill in taking care of Damon is indicative of her increased maturity and parenting skills and is predictive of her ability to care for Donna and Edward.

The Washington County caseworker's testimony was supported by the testimony of Donna Meyers, appellant's aforementioned neighbor. Meyers testified that she sees appellant and Damon on an average of twice per week and she characterized their relationship as a "nice" and "happy" one. *Id.* at 90. She testified that appellant exhibited responsibility toward Damon and is a responsible tenant. *Id.* at 93–94. She stated that Damon is never left alone. When she is away from her home, appellant either asks Meyers' mother to babysit for the child or finds another babysitter. *Id.* at 94. She testified that she has raised two teen-aged children and that Damon behaves like an ordinary six-month-old child. The trial judge concluded that Meyers' experience as a mother qualified her to make that conclusion.

The trial judge acknowledged in his questioning of Donna Meyers that appellant has matured and has shown responsibility toward Damon:

> So I think that she has shown with this six-month-old child, if it is true, and I have no reason to believe it is not true, she has shown that she has grown and developed since the time when she had these two children in terms of her mothering capacity; but the issue as to Donna and Edward is again somewhat different than the issue of dealing with Damon, and I wanted to make sure we are clear about that.

*Id.* at 100.

In the trial court's view, though, the central question was the lack of bonding to Donna and Edward. The trial judge stated: "[T]here is a significant difference in taking a six-month-old from birth and bonding to that child and mothering and growing, so to speak, with that child, and

taking a three-and-a-half-year-old and a four-and-a-half-year-old who have been out of the home for a considerable period of time[.]" *Id.* at 99.

Donna's mother voluntarily requested Children and Youth Services to provide temporary care for Donna in 1977, and again in 1978, at times of physical difficulty and emotional stress in her own life. We must always be on guard lest we place mothers or fathers with meager financial and psychological resources in the painful position of requesting temporary care for their children at the peril of losing those very children. Justice Nix sensitively addressed this problem in *In re William L.*, 477 Pa. 322, 364 n. 4, 383 A.2d 1228, 1249 n. 4 (Nix, J., concurring and dissenting), *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978):

> Financially secure parents suffering from the same mental or intellectual deficiencies as appellant ... conceivably could hire nurses or seek the services of a private agency to aid in their childrearing. Thus, wealthy parents of families may avoid even the possibility of losing their parental rights. On the other hand, indigent parents similarly afflicted must seek aid from public agencies in order to provide for their children. It is indeed ironic that in seeking the only assistance available to them indigent involuntarily incapacitated parents expose themselves to the threat of losing the very reason for the quest for help—their children.

*William L.* was a termination proceeding, but the same considerations are relevant to this custody case. As Justice Nix points out, maternal relationships should not be set aside because another mother may be brighter, better trained, more affluent and more proficient in the discharge of parental responsibilities.

Because I find that the hearing judge determined that the strong bonding to the foster parents precluded an award of custody to appellant[2] and did not give adequate weight to: 1) appellant's continued desire for the return of her chil-

2. We do not believe that a psychologist's testimony as to the psychological bonding between the foster parents and appellant's children

dren, 2) the law's preference for raising siblings together, 3) the suitable nature of appellant's home environment, 4) the absence of evidence supporting a finding that appellant is incapable of providing care for her children, and 5) the testimony of her experts that custody can be successfully transferred to appellant[3], I would reverse the order and return custody to appellant with instructions to the court to provide visitation with the foster parents and with instruction to establish a plan so as to continue with supportive services to the natural mother.

WIEAND, Judge, dissenting:

Under the shibboleth of "broad scope of review" a majority of this Court has determined that an appellate court has a duty to make an "independent determination" in custody cases coming before it for review. I dissent. In my judgment, the determination of the trial judge who has heard the evidence and has seen the witnesses should not be reversed in the absence of an abuse of discretion.

The scope and proper standard of appellate review in custody cases were set forth in the opinion of Justice (now Chief Justice) Nix in *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977) (plurality opinion) as follows:

"It is now beyond dispute that the sole issue to be decided in a custody proceeding ... is the best interests and welfare of the child. Act of June 26, 1895, P.L. 316, § 2, 48 P.S. § 92 (1965); *Commonwealth ex rel. Myers v. Myers*, [468] Pa. [134], 360 A.2d 587 (1976); *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. v. Daven*, 298 Pa. 416, 148 A. 524 (1930). In order to insure such a

should be the determinative factor in deciding with whom custody will be reposed. *See In re Desiree B.,* 304 Pa.Super. 461, 450 A.2d 1003 (1982); *Commonwealth ex rel. Grimes v. Yack,* 289 Pa.Super. 495, 433 A.2d 1363 (1981).

**3.** I take special note of the experts' recommendation of continued contact with the children's foster parents to whom the children are undeniably attached.

focus, our law has long recognized that the scope of review of an appellate court reviewing a custody matter is of the broadest type. *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra; Davidyan v. Davidyan*, 230 Pa.Super. 599, 327 A.2d 145 (1974). Thus, an appellate court is not bound by deductions or inferences made by a trial court from the facts found; *Commonwealth ex rel. Bowser v. Bowser*, 224 Pa.Super. 1, 302 A.2d 450 (1973), nor must a reviewing court accept a finding which has no competent evidence to support it; *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974).

However, we have also taken great care to stress: '... [T]his broader power of review was never intended to mean that an appellate court is free to nullify the fact-finding function of the hearing judge. It is a principle which runs through all our cases that the credibility of witnesses and the weight to be given to their testimony by reason of their character, intelligence, and knowledge of the subject can best be determined by the judge before whom they appear.' *Commonwealth ex rel. Harry v. Eastridge*, 374 Pa. 172, 177, 97 A.2d 350, 353 (1953) (citations omitted).

This fundamental limitation of a reviewing court's power has been articulated by the Superior Court as well in defining its own scope of review in custody matters: '... [W]e have recognized that the trial judge is in a position to evaluate the attitudes, sincerity, credibility, and demeanor of the witness. Because we are not in such a position, *we have recognized that a trial judge's determination of custody should be accorded great weight. Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge.'* Commonwealth ex rel. Rainford v. Cirillo*, 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972)."

*Id.*, 470 Pa. at 294–296, 368 A.2d at 637 (emphasis added).

The majority properly accepts the broad scope of review which the Supreme Court requires of an appellate court in

custody cases but then confuses that scope of review with the standard of review to be applied. Because of this confusion, the majority has erroneously concluded that an appellate court has a duty to make an independent determination of all custody cases coming before it on appeal. Several panel decisions of this Court, it must be conceded, appear to have accepted such a rule. See: *Commonwealth ex rel. Newcomer v. King,* 301 Pa.Super. 239, 447 A.2d 630 (1981); *Robert H.H. v. May L.H.,* 293 Pa.Super. 431, 439 A.2d 187 (1981); *L.D. v. B.D.,* 291 Pa.Super. 589, 436 A.2d 657 (1981); *Jon M.W. v. Brenda K.,* 279 Pa.Super. 50, 420 A.2d 738 (1980). Therefore, it becomes necessary to examine more closely and to determine once and for all time, subject to final review by the Supreme Court, the standard to be applied by this Court in custody appeals.

Because children are one of society's most valuable resources, it is argued, an appellate court must retain the right to make an independent determination in custody cases. Children are too important, the argument implies, to allow their custody to be determined by trial judges. This argument belittles the ability and sincerity of trial judges and is patently wrong. In the first place, there is no basis for the assumption that one who sits on an appellate court has achieved such understanding, experience and Solomonic wisdom that he or she can more nearly achieve a perfectly just and proper award of custody than the trial judge who sees and hears the witnesses. On the contrary, the trial judge, because he or she has seen and heard the witnesses as well as the conduct of and subtle interplay between the interested parties, is in a much better position to evaluate the attitudes, the sincerity, and the credibility of the witnesses than an appellate court. See: *Commonwealth ex rel. E.H.T. v. R.E.T.,* 285 Pa.Super. 444, 448, 427 A.2d 1370, 1372 (1981). Accord: *Commonwealth ex rel. Davenport v. Montgomery County Children and Youth Services,* 501 Pa. 472, 476, 462 A.2d 221, 223–224 (1983); *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 261, 455 A.2d 1180, 1183 (1983). It is precisely because custody decisions

are so important and also because they are sensitive and difficult, that an appellate court must be hesitant about reversing a trial court's decision in the absence of an abuse of discretion.[1]

The chances for achieving a just and proper result will not be enhanced but will be impaired greatly by relying on appellate courts to make independent decisions from printed records. Important elements in deciding custody cases frequently are not contained in the recorded testimony and cannot readily be discerned or deduced from the printed record. These include the trial judge's observations of the witnesses, of glances exchanged between children and their parents, of a grimace, a nod of the head, or a blinking of the eye. Those observations will frequently disclose a great deal more than the credibility of witnesses. They may disclose a love and concern between parent and child or comparative responses to a child's needs which do not readily appear from the printed record. It is for this reason, among others, that an appellate court should not usurp the function of the trial court. Rather, there should be a strong presumption in favor of upholding the trial court's decision. That decision should be overturned only upon a clear and convincing showing that discretion has been abused or the law misapplied.

A broad or searching appellate review in custody cases is entirely proper. A broad review, however, does not vest in the reviewing court either the duty or the privilege of making its own, independent determination. This Court has repeatedly said that it will require from the trial judge in custody cases "a comprehensive opinion reflecting a thor-

---

1. Although the majority denies an intended criticism of trial courts, its entire premise is that trial judges cannot be trusted to make ultimate decisions in custody cases. From personal experience as a former trial judge, the writer can attest that custody decisions are the most difficult, the most gut wrenching, and the most sleep depriving decisions which a trial judge can be called upon to make. Most trial judges have faced decisions in custody cases with a sincere and conscientious resolve to provide in the best way possible for the future of the young lives which they hold in their hands. Custody decisions are such that no judge worthy of his or her robe is likely to take them lightly.

ough analysis of the record ... and specifying the reasons for the ultimate decision." *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 237, 312 A.2d 58, 63 (1973) citing *Commonwealth ex rel. Fox v. Fox,* 216 Pa.Super. 11, 260 A.2d 470 (1969). See also: *Tettis v. Boyum,* 317 Pa.Super. 8, 24, 463 A.2d 1056, 1064 (1983); *Ray v. Ray,* 293 Pa.Super. 216, 218, 438 A.2d 614, 615 (1981); *Commonwealth ex rel. Oxenreider v. Oxenreider,* 290 Pa.Super. 63, 68, 434 A.2d 130, 133 (1981); *In re Custody of White,* 270 Pa.Super. 165, 168, 411 A.2d 231, 232 (1979); *Lewis v. Lewis,* 267 Pa.Super. 235, 240, 406 A.2d 781, 784 (1979); *Gunter v. Gunter,* 240 Pa.Super. 382, 390, 361 A.2d 307, 311 (1976). We have imposed this duty on trial courts in order that we, as a reviewing court, may better determine whether there has been an abuse of discretion. A thorough analysis by the trial court is necessary, we have said, "so that there may be assurance that the presumption has been thus confined, and that the fact finding process and ultimate adjudication did focus on what will serve the best interest of the child." *Commonwealth ex rel. Grillo v. Shuster, supra,* 226 Pa.Super. at 236, 312 A.2d at 63. When an appellate court reserves to itself the right to make an independent determination in custody cases, it reduces the function of the trial judge to that of a master. The trial judge can make recommendations, but it belongs to the appellate court to decide. This is clearly wrong; it is not the function of appellate courts to make independent determinations.

It has been said that children have a surprising resiliency to inexperienced, if not bad, parents. Frequently, a young life can be more severely and permanently scarred by the uncertainty of a protracted custody suit than by a prompt award to either parent or even in some cases to a non-parental, caring third person. A prompt decision in custody cases, supported by presumed finality in the absence of an abuse of discretion, has much to recommend it. It is calculated to achieve promptly an award intended to serve the best interests of the child. It keeps to a minimum the

protracted uncertainty inherent in an appeal in which the losing party invariably gets the proverbial "second bite." It eliminates that lack of stability which has been decried again and again by the courts and by child psychologists alike. Therefore, children, as well as the parties to custody proceedings and the courts themselves, are better served by an "abuse of discretion" standard.

An overwhelming majority of courts in sister states has rejected the right of an appellate court to make an independent determination in custody appeals and has opted for an abuse of discretion standard. These courts have concluded that child custody proceedings are so delicate and sensitive that it would be wholly inappropriate to permit an appellate court to substitute its judgment for that of the trial court. See: *Dimitro v. Dimitro*, 398 So.2d 297, 300 (Ala.Civ.App. 1981) (trial court's custody determination will not be set aside unless plainly wrong); *Sanguinetti v. Sanguinetti*, 628 P.2d 913, 916 n. 3 (Alaska 1981) (trial court is given broad discretion in awarding custody of children and its resolution of issues will be disturbed only if the record convincingly shows an abuse of discretion or that controlling findings of fact were clearly erroneous); *Smith v. Smith*, 117 Ariz. 249, 253, 571 P.2d 1045, 1049 (1977) (appellate court will not overturn trial court's child custody decision in the absence of a clear showing of an abuse of discretion); *Brasher v. Brasher*, 253 Cal.App.2d 867, 868–869, 61 Cal.Rptr. 136, 137 (1967) ("Since important elements of the problem [in a child custody case] are not necessarily contained in the testimony nor easily deduced from the written record, a strong presumption favors the decision of the trial court which will only be overturned on a clear and convincing showing of abuse."); *Christian v. Randall*, 33 Colo.App. 129, 130–132, 516 P.2d 132, 133 (1973) (standard of appellate review is abuse of discretion); *Simons v. Simons*, 172 Conn. 341, 346–348, 374 A.2d 1040, 1043 (1977) (abuse of discretion); *Kahn v. Kahn*, 252 A.2d 901, 903 (D.C.1969) ("Award of custody presents to trial court a most serious and difficult question, and we are slow to

substitute our collective judgment for that of the trial court."); *Johnston v. Boram*, 386 So.2d 1230, 1230 (Fla. Dist.Ct.App.1980) (clear abuse of discretion); *Brock v. Little*, 241 Ga. 549, 550, 246 S.E.2d 668, 669 (1978) (abuse of discretion); *Fujikane v. Fujikane*, 61 Haw. 352, 354–355, 604 P.2d 43, 45 (1979) (manifest abuse of discretion); *Overman v. Overman*, 102 Idaho 235, 238, 629 P.2d 127, 130 (1980) (abuse of discretion); *Drake v. Hohimer*, 35 Ill. App.3d 529, 531–532, 341 N.E.2d 399, 402 (1976) (manifest injustice); *Williams v. Trowbridge*, Ind.App., 422 N.E.2d 331, 333 (1981) (manifest abuse of discretion); *Harris v. Johnson*, 149 Ind.App. 512, 517–518, 273 N.E.2d 779, 781 (1971) ("Because of the intimate and personal nature of the decisions of trial judges regarding custody, courts of review have properly exercised great judicial restraint in respect to such decisions on appeal."); *Treiber v. Stong*, 5 Kan.App.2d 392, 397–398, 617 P.2d 114, 119 (1980) (abuse of discretion); *Taylor v. Taylor*, 591 S.W.2d 369, 370 (Ky.1979) (trial court's determination must be clearly erroneous, an abuse of discretion); *Dudgeon v. Dudgeon*, 458 S.W.2d 159, 160–161 (Ky.1970) (A very clear and substantial showing of manifest error on the part of the trial court is required before an appellate court should substitute its judgment for trial court's.); *Bordelon v. Bordelon*, 390 So.2d 1325, 1329 (La.1980) (clear abuse of discretion); *Sheldon v. Sheldon*, 423 A.2d 943, 945–946 (Me.1980) (" '[I]t would be inappropriate for us to reevaluate the facts from a cold record in an effort to find error.' *Cooley v. St. Andre's Child Placing Agency*, Me., 415 A.2d 1084, 1087 (1980) quoting *O'Malley v. O'Malley*, Me., 338 A.2d 149, 153 (1975). It is not the role of an appellate court in reviewing a child custody order to substitute its judgment for that of the trial court .... [']An appellate court's independent evaluation of the evidence is especially inappropriate in a delicate issue of this sort.' *Cooley*, 415 A.2d at 1086 ...."); *McAndrew v. McAndrew*, 39 Md.App. 1, 382 A.2d 1081 (1978) (limited appellate review); *Prindle v. Fisk*, 2 Mass.App. 843, 844, 311 N.E.2d 586, 587 (1974) (trial court must be plainly wrong); *Wallin v. Wallin*, 290 Minn. 261, 266–268, 187

N.W.2d 627, 631 (1971) (clear abuse of discretion in the sense that the trial court's custody order was arbitrary, unreasonable, or without evidentiary support); *Yates v. Yates,* 284 So.2d 46, 47–48 (Miss.1973) (manifest error); *In re Marriage of McLean,* Mont., 609 P.2d 282, 284 (1980) (clear abuse of discretion); *Petersen v. Petersen,* 190 Neb. 805, 806–807, 212 N.W.2d 580, 581 (1973) (clear abuse of discretion or clearly against the weight of the evidence); *Norris v. Graville,* 95 Nev. 71, 72–73, 589 P.2d 1024, 1025 (1979); *LaPoint v. Girard,* 74 A.D.2d 656, 657, 424 N.Y. S.2d 857, 858 (1980) (abuse of discretion); *Falls v. Falls,* 52 N.C.App. 203, 278 S.E.2d 546 (1981) (abuse of discretion); *Jarman v. Jarman,* 14 N.C.App. 531, 188 S.E.2d 647, *cert. denied,* 281 N.C. 622, 190 S.E.2d 465 (1972) (error of law on the face of the record); *Miller v. Miller,* 305 N.W.2d 666, 671 (N.D.1981) (clearly erroneous; definite and firm conviction that a mistake has been made); *Rice v. Rice,* 603 P.2d 1125, 1128 (Okl.1979) (abuse of discretion); *Paolino v. Paolino,* R.I., 420 A.2d 830, 834 (1980) (improper exercise of discretionary power or an abuse thereof); *O'Conner v. O'Conner,* 307 N.W.2d 132, 136 (S.D.1981) (clear case of abuse); *Altamirano v. Altamirano,* 591 S.W.2d 336, 338 (Tex.Civ.App.1979) (clear abuse of discretion); *Tom v. Baker,* 556 P.2d 213, 216 (Utah 1976) (abuse of discretion/error of law); *In re Gregoire,* 71 Wash.2d 745, 747, 430 P.2d 983, 983 (1967) (strong reliance on trial court's determination of what is in child's best interests); *Horton v. Horton,* 264 S.E.2d 160, 163 (W.Va.1980) (clear abuse of discretion); *Heiting v. Heiting,* 64 Wis.2d 110, 118–120, 218 N.W.2d 334, 339 (1974) (abuse of discretion/error of law).

I would follow this view and hold that an "abuse of discretion" standard is proper in deciding custody appeals. Under this standard, an appellate court would not reverse a custody order unless it were evident that the trial court had abused its discretion, committed an error of law, or lacked evidentiary support for its findings. Applying such a standard in the instant case, I would conclude that the order of the trial court should be affirmed.

88

When this matter was previously before a panel of this Court in *In re Donna W.*, 284 Pa.Super. 338, 425 A.2d 1132 (1981), the facts were recited as follows. "The subjects of these proceedings are Donna, born October 8, 1976 and Edward, born November 9, 1977. The events leading up to their being adjudicated dependent and placed in foster care are as follows. In April, 1977, appellant [their mother] requested Children and Youth Services of Allegheny County (CYS) to provide immediate temporary foster care for Donna. Appellant, then age 17, sought this assistance because she was having serious marital problems and was suffering from a nervous condition associated with her pregnancy with Edward. CYS provided foster care for several weeks and then returned Donna at appellant's request. CYS became involved with the family again in June, 1977, following renewed marital problems in appellant's household. Over the next several months CYS attempted to work with the family and arranged for their participation in a parenting program. During this period Edward was born, and he too was included in the program. Despite the assistance of CYS, the family's problems worsened. Appellant and her husband separated, and the husband was later arrested for automobile theft. Appellant soon found herself without suitable housing for herself and the children. Consequently, on March 30, 1978, appellant once again contacted CYS to request that her children be placed in temporary foster care. CYS arranged for such care immediately and then proceeded to file a dependency petition in the court below. On May 23, 1978, after a hearing the court adjudicated Donna and Edward dependent and ordered CYS to assume custody with authorization to place the children in foster care. *Appellant did not appeal this order.*" *Id.*, 284 Pa.Superior Ct. at 340–341, 425 A.2d at 1133 (emphasis added) (footnote omitted).

More than a year later, appellant petitioned the court to establish a plan for returning the children to her. By then, she and her husband had been divorced. However, her life had not yet been stabilized. Appellant's visits with her

children were increased, but the court refused to order the children returned to her custody until definite housing arrangements had been made and appellant's parenting abilities had been demonstrated. On January 30, 1980, at what was intended to be the final hearing, the court learned that appellant had been sexually involved with, perhaps raped by, a sixteen year old boy whom she had invited home one evening. The court ordered the children to remain in foster care until further review at a later time.

This Court, having reviewed the record on an appeal from the trial court's order, remanded "in order for the court to reconsider appellant's fitness as a custodian in light of both the evidence already presented and present circumstances as revealed through additional testimony." *Id.*, 284 Pa.Superior Ct. at 348, 425 A.2d at 1137. In remanding, the Court observed, ". . . although the [trial] court concluded that the evidence 'mitigates [sic] against removal of the two children from a stable, healthy environment which they have known for two years,' . . . the record in fact is totally devoid of any evidence regarding the nature and quality of the children's foster placements, the degree of attachments which the children have formed in foster care, and the effect which return of the children would have on them." *Id.*, 284 Pa.Superior Ct. at 349, 425 A.2d at 1137.

This was more than two and a half years ago. The children have now been raised by foster parents for more than five years. Subsequent hearings held by the trial court pursuant to this Court's remand order produced evidence, found credible by the trial court, that both Donna and Edward were receiving excellent care in foster homes and had interacted well with their respective foster parents, who loved them and were loved by the children in return. The children's foster care had been interrupted briefly, with unfortunate, adverse consequences, the evidence showed, when appellant abducted them following a visit on August 26, 1980 and kept them until they were returned to the custody of their foster parents by court order and attachment on September 1, 1980. The children's interaction with

appellant during those five days was extremely poor. It continued to be poor on subsequent visits.

Dr. Neil Rosenbloom, a clinical psychologist employed by the Child Guidance Clinic and attached to the University of Pittsburgh, was one of three experts who testified. The hearing judge reviewed the credibility of all three expert witnesses. He expressly found Dr. Rosenbloom's testimony credible and entitled to greater weight than the testimony of the other witnesses. This Court is required to accept the trial court's finding on credibility.

Dr. Rosenbloom described his own observations regarding appellant's immaturity and her failure to comprehend, much less respond to, the special needs of Donna, who possessed a borderline retarded intelligence level. Edward, he said, was uncomfortable with his natural mother and irritable in her presence. Appellant was also uncomfortable and tentative with the son whom she had never parented. She conceded that it would be difficult to establish a relationship with him. It was the opinion of Dr. Rosenbloom that a precipitous removal of the children from their foster parents in favor of an award of custody to appellant would be harmful. He said that the foster parents could better provide for the children's needs and that in the immediate future it would be in the children's best interests to remain with such foster parents. An ultimate return of custody to appellant could be achieved gradually, he said, and should be accompanied by intensive counselling.

In this case, it will be recalled, there was clear necessity for separating these children from appellant. Because appellant had been wholly unable to house or care for the children, she voluntarily delivered them to CYS. When the children were subsequently adjudicated "dependent" and placed in foster care, she did not appeal. In the present proceedings to determine custody, the court was required to determine and adhere to the children's best interests.

The law applicable to the facts of this case was well stated by our colleague, the Honorable J. Sydney Hoffman, when the matter was previously before a panel of this

Court in *In re Donna W., supra.* Because we cannot improve on his statement of the law, we adopt the same and incorporate it herein.

" '... [O]nce the child has been taken from the parents, the court will appraise the evidence, and award custody, according to the child's *best interests.* In applying this standard the court will recognize the natural parents' claim to custody. In a given case this claim may prove of decisive weight; *the particular circumstances of each case, including such facts as the length of time the child has been separated from their parents,* must be taken into account.' *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 391, 324 A.2d 562, 572 (1974).

"As we noted in *Stapleton, supra,* 'the natural parents' claim to custody' is a significant, and sometimes decisive factor in custody disputes such as this one. Indeed, our cases have long recognized 'that depriving a parent of [his or] her child is one of the most serious interferences that the state can impose on an individual.' *Milligan v. Davison,* 244 Pa.Super. 255, 261, 367 A.2d 299, 302 (1976). See also *In re William L.,* 477 Pa. 322, 383 A.2d 1228 (1978); *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 66 A.2d 300 (1949); *In the Interest of LaRue* [244 Pa.Super. 218, 366 A.2d 1271 (1976) ], *supra; Rinker Appeal,* 180 Pa.Super. 143, 117 A.2d 780 (1955). Moreover, in a slightly different context, our courts have acknowledged the importance of natural parents' claims to custody by requiring third parties seeking custody to meet a substantial evidentiary burden. Accordingly, '[w]hen the judge is hearing a dispute between the parents, or a parent, and a third party, ... [t]he question still is, what is in the child's best interest? However, the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all

evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.' *Ellerbe v. Hooks,* 490 Pa. 363, 367–68, 416 A.2d 512, 513–14 (1980) (quoting *In re Custody of Hernandez,* 249 Pa.Super. 274, 286, 376 A.2d 648, 654 (1977)). See also *Commonwealth ex rel. Patricia L.F. v. Malbert J.F.,* [278] Pa.Super. [343], 420 A.2d 572 (1980). In adopting this standard, our Supreme Court has pertinently· noted that 'deference to the parental relationship is not an archaic adherence to any property rights theory of the family.... Our determination today is only an appropriate recognition that the blood relationship of parenthood has traditionally served and continues to serve as our society's fundamental criterion for allocating control over and responsibility for our children, and that without some showing of harm, the courts should not interfere with that arrangement.' *Ellerbe v. Hooks, supra* [490 Pa.] at 369, 416 A.2d at 514–15.

"Notwithstanding the acknowledged importance of the parental interest in custody, application of the 'best interests' standard requires the court to consider other factors in making its determination. Our Supreme Court has stressed this fact in custody disputes between parents and third parties, and its observations in that context are equally relevant here. In *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980), the Court stated that 'the *Hernandez* standard, adopted by this Court in *Ellerbe,* was intended to emphasize the importance of the maintenance of the parental relationship, yet at the same time permit the hearing court to award custody to the third party where the best interests of the child will be clearly served by such a decision. This point is best demonstrated by the fact that this Court in *Ellerbe,* after embracing the *Hernandez* standard, applied it and sustained the decision of the hearing court awarding custody to the maternal grandmother. *Ellerbe v. Hooks, supra....* Restated, the standard in this area is not to be construed as precluding a

custody award to a non-parent, absent a demonstration of the parent's dereliction. *We again emphasize that the standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well being of the child can justify a finding in favor of the non-parent, even though the parent has not been shown to have been unfit.'* *Id.,* 491 Pa. at [326, 328], 421 A.2d at 160–61 (footnote omitted). See also *Ellerbe v. Hooks, supra,* 490 Pa. at 368, 416 A.2d at 514 ('No doubt in some instances the best interests of the child are served by awarding custody to a non-parent.'). Factors of importance in determining the best interests of a child in any custody dispute include, *inter alia:* (1) *'the length of time the child has been separated from the parents,'* *Stapleton, supra* [228 Pa.Super.] at 391, 324 A.2d at 573; (2) *'[t]he adverse effect upon the development of youngsters caused by the disruption of an established stable relationship,'* *Albright, supra* [491 Pa.] at [327], 421 A.2d at 160; (3) the desirability of raising siblings together 'whenever possible,' *id.;* and (4) the fitness of the party or parties seeking custody, see, e.g., *Commonwealth ex rel. Leighann A. v. Leon A.,* [280] Pa.Super. [249], 421 A.2d 706 (1980). *See generally A. Momjian & N. Perlberger, Pennsylvania Family Law,* §§ 5.1, 5.3 (1978). The latter consideration is, of course, especially important when a parent is seeking the return of a dependent child, since in many cases the original finding of dependency and removal of the child resulted from the parent's past unfitness to retain custody." *Id.* 284 Pa.Super. at 343–346, 425 A.2d at 1134–1136 (emphasis altered).

In the instant case, the trial judge followed and applied this law impeccably. After determining issues of credibility, he found that the children had been separated from appellant and from each other almost since birth. During this separation their primary care had been provided continuously by foster parents. He found, consistently with Dr. Rosenbloom's testimony, that a precipitous disruption of the established, stable relationship which the children enjoyed

with their foster parents would be harmful to them. It may be noted parenthetically that this conclusion, as well as the psychologist's opinion, had already been illustrated and confirmed by the unfortunate effect on the children of their abduction by appellant. When all of this evidence was considered in the light of appellant's history of immaturity and inability to parent these children, the trial court determined that the children should for the immediate future and until they achieved greater maturity so as to cope with change, remain in the custody of CYS in foster homes.

There was no abuse of discretion in this order. On the contrary, the record demonstrates clearly that the court's order was consistent with and founded upon the best interests of Donna and Edward. If, at some future time, appellant can show that circumstances have changed so that the best interests of the children will be served by returning custody of them to their natural mother, the present order can be appropriately altered. Meanwhile, I would not impose upon the trial court the responsibility to "provide the mother with support and training in the development of her skills as a parent." It is the business of courts to decide cases. Where, as here, an error-free decision has been made, I would affirm that decision.